Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| EL PUEBLO DE PUERTO RICO<br><br>*Apelada*<br><br>v.<br><br>JUAN A. CABRERA ELIZA<br><br>*Apelante* | KLAN202500213 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.:<br>E VI2023G0016<br><br>Sobre:<br>Art. 93A |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 14 de abril de 2026.

Comparece el señor Juan A. Cabrera Eliza (señor Cabrera Eliza o apelante) quien nos solicita la revocación de la *Sentencia*[1] dictada en su contra el 18 de febrero de 2025 por el Tribunal de Primera Instancia, Sala Superior de Caguas (TPI o foro apelado). Mediante el referido dictamen, el foro apelado condenó al apelante a cumplir una pena de noventa y nueve (99) años de cárcel, tras haber sido hallado culpable por jurado, con un veredicto unánime (12-0), por haberle causado la muerte a Tania Ríos González (señora Ríos González) por medio de estrangulamiento, según previsto por el Artículo 93(a) del Código Penal de Puerto Rico[2].

No obstante, el apelante razona que existen varias incidencias ocurridas durante el juicio en su fondo, a saber: testimonios y la prueba documental presentada por el Ministerio Público, que establecen la duda razonable sobre su culpabilidad. Además, alega que el Pueblo falló en demostrar con prueba contundente que sea él el autor de dicho acto. Asimismo, aduce que de la propia prueba del

---

[1] Notificada el 27 de febrero de 2025.
[2] 33 LPRA secc. 5142.

Número Identificador

SEN2026_____

Ministerio Público surge que la señora Ríos González deliberadamente cometió actos conducentes al suicidio.

Adelantamos que los argumentos esgrimidos por el apelante no nos persuaden para intervenir con el juicio valorativo de la prueba efectuado por el Jurado, es decir, sobre la causa de la muerte y su conexión con el apelante, de modo que nos corresponde ***confirmar*** la sentencia apelada.

## I.

El Ministerio Público presentó una acusación contra el apelante por el delito de asesinato en primer grado cometido contra la señora Ríos González en violación al Artículo 93(a) del Código Penal de Puerto Rico[3]. En el pliego acusatorio se sostuvo que:

> El (La) referido(a) acusado(a) JUAN A. CABRERA ELIZA, allá en o para el día 29 DE NOVIEMBRE de 2020 y en el Municipio de Gurabo, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de CAGUAS, ilegal, voluntaria, criminal, intencionalmente y a propósito: le ocasionó la muerte al ser humano TANIA RÍOS GONZÁLEZ, con quien sostenía una relación consensual por aproximadamente cuatro años, mediante estrangulación con una ligadura y golpes en su cuerpo.

Así las cosas, el juicio en su fondo fue celebrado ante Jurado en las siguientes fechas: 28, 29 y 30 de agosto de 2024, 9 de octubre de 2024 y 16 y 17 de diciembre de 2024. El honorable juez que atendió el juicio realizó la lectura de las instrucciones al jurado.

La prueba documental presentada por el Pueblo consistió en lo siguiente:

1. Informe de Hallazgos de Escenas del Instituto de Ciencias Forenses (ICF);
2. Fotografías de la escena producidas por el ICF;
3. Solicitud de Análisis Forense NAS-20-0850;
4. Solicitud de Servicio Forense N-20-0631;
5. Informe de Incidentes y/o Novedades firmado por Jorge del Valle;
6. Informe de Incidentes y/o Novedades firmado por Migdalia del Valle;
7. Orden Registro y Allanamiento;
8. Informe de Solicitud de Análisis SAR-21-0073;
9. Solicitud de Servicios Alternos; Solicitud de Servicios Forense DNAS-21-0211;
10. Solicitud de Servicio Forense DNAS-21-0211;

---

[3] *Id.*

11. Carta de Enmienda a Certificado de Análisis Forense de ADN; DNA-20-0822;
12. Documento titulado Advertencias Miranda para persona sospechosa en custodia el 16 de marzo de 2021;
13. Informe de Incidentes y/o Novedades suscrito por Karl Marie Ortega Calderón;
14. Informe Médico Forense de Patología PAT 5256-20 y fotografías de patología;
15. Informe Médico Forense de Patología PAT 5256-20;
16. Documento Suplementario de Hallazgos de Autopsia DNAS-20-0822.

La prueba testimonial desfilada por la misma parte se compuso de doce (12) testigos, de los cuales dos (2) peritos, a saber:

1. Sargento Erick Rodríguez Denis;
2. Yaritzia Ramos Díaz (investigadora del ICF);
3. Agente Orlando Ortiz Cotto;
4. Jorge Luis del Valle Pagán (empleado de seguridad);
5. Migdalia del Valle Cruz (empleada de seguridad);
6. Waldimán Reyes Martínez;
7. Windalyz Torres Santiago (analista de ADN);
8. Aixa I. Estrada Franco;
9. Edward Rumser Cintrón;
10. Agente Jesús Torres Ramírez;
11. Karl Marie Ortega Calderón
12. Dr. Javier Gustavo Serrano Serrano, patólogo del ICF.

A continuación, procedemos a realizar un breve resumen relevante a la controversia presentada por el apelante. Ya que esencialmente se cuestiona la apreciación de la prueba, nos detendremos con algún grado de detalle en los testimonios de los testigos enumerados previamente. Además, resumimos la prueba, de modo que presente los hechos en orden cronológico, sin embargo, obviamos el orden en que fue presentada en el juicio[4].

## 1. Sr. Jorge Luis Del Valle Pagán (Sr. Del Valle)

Los hechos datan a la noche del 28 de noviembre de 2020. El testigo, Sr. Del Valle, declaró que para la fecha indicada trabajaba para *World Security Services* como empleado de seguridad, y daba rondas en la Urbanización Veredas de Gurabo[5]. Relató que al iniciar su turno y realizar la primera ronda, sostuvo una interacción con la señora Ríos González[6]. Que esta salió de la Residencia Núm. 458

---

[4] Se omite de este recuento los testigos de cadena de custodia, por no plantearse ante nosotros controversia sobre tal asunto probatorio.
[5] Transcripción de la prueba oral, pág. 196, líneas 29-43; pág. 197, líneas 1-3. En adelante, toda referencia a la transcripción se denotará como TPO.
[6] TPO, pág. 201, líneas 20-52; pág. 202, líneas 1-26.

—residencia del señor Cabrera Eliza para la fecha de los hechos— detuvo la patrulla y consultó si tenía cigarrillos[7]. Esta interacción culminó sin acontecimientos adicionales[8].

El Sr. Del Valle luego testificó que, para las diez de la noche le correspondía realizar una segunda ronda, cuando se encontró al apelante. Narró que, el señor Cabrera Eliza salió de la Residencia Núm. 458 y le indicó que la señora Ríos González le había mordido el labio, por lo que suplicó al guardia que la sacaran de la residencia[9]. El Sr. Del Valle le replicó que los guardias no podían removerla, que le correspondía a él llamar a la policía[10]. También testificó que observó al señor Cabrera Eliza y no logró ver una marca de mordedura[11]. Resaltó que su interacción con el apelante terminó cuando este expresó que "lo que le pase a ella nosotros somos responsables"[12].

Durante su testimonio, el Sr. Del Valle manifestó que más tarde en la noche (a una hora indeterminada) recibió notificación mediante radiocomunicación que su compañero de rondas, el Sr. John Alex, había acudido a la residencia del señor Cabrera Eliza porque había "oído unos ruidos" y "que habían ... como unas discusiones ... y que había, verdad, unos problemas allí"[13]. Con esta información, el Sr. Del Valle regresa nuevamente a la residencia del apelante, siendo esta la tercera ocasión que intervino allí. Al llegar, el Sr. Del Valle observó a la señora Ríos González sentada de espalda en la entrada de la marquesina de la residencia, mirando hacia adentro, y al señor Cabrera Eliza en la entrada de la casa[14]. Según

---

[7] *Íd.*

[8] *Íd.*

[9] TPO, pág. 203, líneas 18-50; pág. 204, líneas 1-11. Aunque del testimonio oral surge que haya indicado aquí que era la residencia 459, debe entenderse que hacía referencia a la 458.

[10] TPO, pág. 204, líneas 46-49; pág. 205, líneas 1-17.

[11] TPO, pág. 204, línea 36.

[12] *Íd.*, líneas 50-52.

[13] TPO, pág. 207, líneas 14-37.

[14] TPO, pág. 208, líneas 14-17, 33-41. Conviene detallar en este instante que la marquesina es abierta (sin puerta de garaje). Para una imagen de la parte fronteriza de la casa, ver en Exhibit 2 del Ministerio Público, imagen 1676. Para

narró el testigo, la señora Ríos González se encontraba buscando algo dentro de su cartera de manera desesperada[15], y el señor Cabrera Eliza volvió a pedirle que la sacaran[16]. Manifestó que, igual que la vez anterior, le contestó al apelante que no tenían la autorización para removerla y que le correspondía a él mismo contactar a la policía[17]. También, le dijo al señor Cabrera Eliza que regresara al interior de su casa y que dejara a la señora Ríos González tranquila, que ellos estarían pendientes mientras daban las rondas[18]. Indicó que el señor Cabrera Eliza contestó con molestia que la dejaría allí (aludiendo a la señora Ríos González), que se iría a dormir y repitió que ellos serían responsables de algo ocurrirle a ella[19].

El Sr. del Valle relató que en su hora de "break" (alrededor de la una de la mañana), la señora Ríos González se acercó a la patrulla donde estaba comiendo, para preguntar si alguno de los empleados de seguridad iba a salir de la urbanización para echar gasolina o a comprar algo[20]. El Sr. del Valle le respondió que no, debido a que no estaban autorizados a sacar las patrullas de la urbanización. Ante esto, la señora Ríos González, primero preguntó si podía salir y, seguido, le mencionó que el señor Cabrera Eliza había dejado informado en la caseta que no la dejaran entrar. El Sr. del Valle le aconsejó que se comunicara con la empleada de la caseta y viera si esta le brindaba una oportunidad para salir y regresar[21]. Este testificó que la observó caminar a la caseta y luego regresar en dirección a la casa del Sr. Cabrera Eliza[22].

---

propósitos ilustrativos, véase también Exhibit 1 del Ministerio Público: *Informe de Hallazgos de Escena*, el cual contiene un croquis de la residencia.

[15] El detalle de cómo se encontraba la Sra. Ríos González se encuentra en la TPO, pág. 208, líneas 23-28; pág. 209, líneas 10-12.

[16] TPO, pág. 208, líneas 33-41.

[17] *Íd.*

[18] TPO, pág 208, líneas 47-51; pág 209, líneas 19-25.

[19] TPO, pág. 209, líneas 19-25, 29.

[20] TPO, pág. 211, líneas 23-52; pág. 212 líneas 1-7.

[21] TPO, pág. 212, líneas 11-41.

[22] *Íd.*, líneas 43-51; pág. 213, líneas 1-37.

Así pues, narró que al regresar de su "break", aproximadamente a las dos de la mañana, pasó por la Residencia Núm. 458 y observó que la señora Ríos González se encontraba en la marquesina de la casa[23]. Luego de culminar esa ronda, indicó a su compañero, John Alex, que deberían estar más pendientes a la Residencia Núm. 458, para asegurar que "no vaya a pasar nada"[24]. Más tarde en la madrugada (cerca de las 3:00am), el Sr. del Valle pasó por la Residencia Núm. 458 y volvió a localizar a la señora Ríos González en la marquesina, pero no vio "ninguna novedad" y prosiguió con la ronda[25]. Indicó que pasó nuevamente a las tres de la mañana y que no vio a la señora Ríos González[26].

Explicó que al finalizar su turno generó un informe en un documento intitulado "Informe de Incidentes y/o Novedades", donde documentó que:

> como a eso de las 2:00am de la mañana los residentes de la 458# del cluster 4# discutían procedimos llegar hasta allá para ver que todo estuviera bien el residente pedía que sacaran la esposa de su casa le indicamos que nosotros no pidamos sacarla de la casa que tenia que llar la Policía para que la sacara y siguió llamado un montón de veces a caseta[27].

Al culminar su testimonio, manifestó que le advirtió a la Sra. Migdalia del Valle (quien, para evitar confusión, se identificará por su nombre completo) que estuviera pendiente a la Residencia Núm. 458, que ellos estuvieron "bregando con la situación ... toda la noche"[28].

El testimonio del Sr. del Valle fue confrontado por su informe de incidentes y por la declaración jurada que prestó para este caso. Entre otras cosas, salió a relucir que, tanto en la vista preliminar como en la declaración jurada, *había omitido mencionar que los*

---

[23] TPO, págs. 216-217.
[24] TPO, pág. 217, líneas 1-17. También testificó que le preocupaba que el Sr. Cabrera Eliza fuese a agredir a la Sra. Ríos González, *véase* TPO, pág. 217, líneas 45-47.
[25] TPO, pág. 220, líneas 8-10, 36-39.
[26] TPO, pág. 222, líneas 10-14, 21-22.
[27] *Véase* Exhibit 5 del Ministerio Público.
[28] TPO, pág. 230, líneas 25-44.

*vecinos se hubieran quejado de ruido o que hubieran llamado alertando sobre discusiones, careos o situaciones parecidas*[29]. Tampoco, había hecho referencia a las llamadas que realizó el Sr. Cabrera Eliza a la caseta[30]. Por último, admitió que en su primera interacción con el Sr. Cabrera Eliza, lo notó *"hinchado"*[31].

### 2.    Karl Marie Ortega Calderón (señora Ortega Calderón) y Sra. Migdalia Del Valle Cruz (señora Migdalia Del Valle)

Por la relación de los testimonios de la señora Migdalia Del Valle y la señora Ortega Calderón, se resumen en conjunto. Para la fecha de los hechos, ambas testigos trabajaban para *World Security Services*. Estas brindaban servicios de seguridad a la Urbanización Veredas en Gurabo. La señora Migdalia Del Valle tenía la función de dar las rondas por la urbanización, mientras que, la señora Ortega Calderón fungía como empleada de caseta[32].

La **señora Ortega Calderón** testificó que, el 29 de noviembre de 2023 a las nueve de la mañana (9:00am) recibió una llamada de parte del señor Cabrera Eliza, quien le solicitó que sacaran a la señora Ríos González de su residencia[33]. Tras dialogar con él, la señora Ortega Calderón notificó a la señora Migdalia Del Valle que pasara por la Residencia Núm. 458. Treinta y cinco (35) minutos después, la señora Ortega Calderón recibió otra llamada del señor Cabrera Eliza en la que [...] *el vuelve y me exige que le indique a la seguridad que pase y que saque la dama. Que él quiere sacarla de allí y necesitaba que la seguridad llegara para que la pudiera sacar, porque él no la quería allí*[34]. A preguntas de la fiscal Díaz, la señora Ortega Calderón leyó el exhibit número catorce (14) *Informe de Incidentes y/o Novedades* con fecha del 29 de noviembre de 2020:

---

[29] TPO, pág. 235, líneas 6-39; pág. 238, líneas 23-51.
[30] TPO, pág. 248, líneas 9-14.
[31] TPO, pág. 240, líneas 30-52; pág 241, líneas 1-18.
[32] TPO, pág. 266-267; pág. 591-592.
[33] TPO, pág. 594, líneas 45-52; pág 595, líneas 1-18.
[34] TPO, pág. 595, líneas42-52, pág. 596, líneas 1-5, y la pág. 601, líneas 33-43.

"*Nueve y treinticinco de la mañana, recibo llamado telefónica a caseta del señor Juan Cabrera, residente, de la residencia cuatro, cinco, ocho. Indicándome, alterado, que llame a la Policía, para que saquen a esta de aquí. Se orientó al señor Juan Cabrera que debe ser él, el que se comunique con la Policía, ya que, el asunto es personal. Él se altera más y me dice, cito, "Que para que entonces él paga una seguridad". Le indiqué al señor Cabrera que enviaría la ronda para que hable con él. Y ahí él me dice, cito "ella está aquí tirada en el piso, de la cocina y no me contesta. A lo mejor se ahorcó". Le pedí nuevamente a ronda uno, que verifique. Y a las nueve y treintiocho, llamé a la Policía Estatal, línea ocupada. Procedo a llamar al nueve, uno, uno, y notifiqué fémina inconsciente en el suelo. A las nueve y cuarenta y seis de la mañana llegó la Policía Estatal, agente Rodríguez, placa treinta y cuatro, uno, cinco, cuatro; agente Ortiz placa veintiuno, seis, treinta y siete. A las nueve y cincuenta y siete de la mañana, llegó ambulancia del Municipio de Gurabo, tablilla "M" "U" veinte cuatro, doce. Y salió de la urbanización esa ambulancia a las diez y trece de la mañana. A las once y dos de la mañana, llegó el agente Luna, tablilla "G" "O" sesenticuatro dieciséis, Teniente Ana Burgos, tablilla "G" "O" ochenta y tres veintiséis. A las once y cincuenta y cinco de la mañana, llegó el teniente Casillas, con tablilla "G" "O" cuarenta y ochenta y ocho del área de investigación. A la una y cuarentinueve llegó el agente Oliveras, con la tablilla "G" "O" sesenticuatro, cero, nueve. De la División de Homicidio. Y a las dos y veinte, llegó el personal de Ciencia Forense a recoger el cuerpo*"[35].

Por su parte, la **señora Migdalia Del Valle** testificó que la señora Ortega Calderón le había indicado que pasara por la Residencia Núm. 458, ya que el señor Cabrera Eliza había llamado llorando e indicando que había sucedido algo[36]. Cuando la Sra.

---

[35] TPO, págs. 602-603.
[36] TPO, pág. 269, líneas 45-50.

Migdalia Del Valle llegó a la casa, encontró al Sr. Cabrera Eliza llorando y desesperado en la puerta[37]. Esta le inquiere sobre qué había pasado, a lo cual el Sr. Cabrera Eliza responde "mira lo que hizo ... la mujer esta"[38]. Al entrar a la residencia del Sr. Cabrera Eliza, la Sra. Migdalia Del Valle se asomó y miró por la puerta de la sala, llegó hasta la cocina, donde pudo observar el cuerpo de la señora Ríos González en el piso sentada con las piernas cruzadas[39]. Ella relata que el Sr. Cabrera Eliza le indica que Tania se había ahorcado, a lo cual contestó "¿cómo se ahorcó, porque no veo soga ni silla?"[40]. El Sr. Cabrera Eliza le responde alzándole la cabeza al cuerpo de la occisa, para que esta pudiera ver la ligadura (aunque la Sra. Migdalia Del Valle no indicó en su testimonio que observó la ligadura). De ahí, la señora Migdalia Del Valle se comunicó con la señora Ortega Calderón, informándole que parecía que la señora Ríos González se había suicidado y solicitó que llamara a la policía.

Al recibir la información, la señora Ortega Calderón llamó al 911 y notificó la situación. La señora Ortega Calderón primero intentó llamar al cuartel municipal y a la policía estatal sin tener éxito[41]. La policía llegó a las 9:46am, emergencias a las 9:57am, a las 11:02am el agente Cruz Luna y a las 2:20pm Ciencias Forenses[42]. Ambas empleadas generaron *Informe de Incidencias y/o Novedades*[43]. El informe de la señora Migdalia Del Valle contenía lo siguiente:

---

[37] TPO, pág. 270, línea 51; pág. 271, línea 1.
[38] TPO, pág. 271, líneas 6-12.
[39] TPO, pág. 271, líneas 14-34. Para una imagen de la escena, ver Exhibit 2 del Ministerio Público, imagen 1689.
[40] TPO, pág. 271, líneas 43-45.
[41] TPO, pág. 596, líneas 30-40.
[42] Las horas de llegada surgen también del informe preparado por la Sra. Ortega Calderón, Exhibit 14 del Ministerio Público. El informe desglosa las llegadas en el siguiente orden:
        9:46 am – Policía estatal
        9:57 am – Ambulancia
        11:02 am – Agente Luna y Teniente Ana Burgos
        11:55 am – Teniente Casillas
        2:20 pm – Personal de Ciencias Forenses
[43] Exhibit 6 del Ministerio Público (informe preparado por Migdalia del Valle); Exhibit 14 del Ministerio Público (informe preparado por Karl Marie Ortega Calderón).

> A las 9:35 caseta me tira diciéndome que pasara por la res.
> # 458 calle 46. Donde el Sr. Cabrera llamó informando que
> su compañera Tania, estaba muerta. Al pasar a la residencia
> el Sr. Cabrera gritando me dijo que estaba muerta, que se
> había horcado que llamara la policía y procedí a informarle
> a caseta que llamara 911 y notificara y espere la policía al
> llegar la policía salí de la puerta hacia fuera esperar que me
> dijera que me fuera y tomaron mis datos.

Del informe de la señora Ortega Calderón se desprende que, en la segunda ocasión que llamó el Sr. Cabrera Eliza, este indicó que la Sra. Ríos González se encontraba "a[hí] tirada en el piso de la cocina, no me contesta, a lo mejor se ahorcó", ante lo cual esta procede a pedirle a la Sra. Migdalia Del Valle que pase por la residencia[44].

3. **Sargento Erick Rodríguez Denis, (Sgto. Rodríguez) y Agente Orlando Ortiz Cotto (Agte. Ortiz).**

Los testimonios en esta sección corresponden a los dos agentes de la Policía de Puerto Rico que llegaron primero a la escena del crimen. Ambos agentes estaban en función de patrullaje en el Distrito de Gurabo el 29 de noviembre de 2020, cuando recibieron información sobre una querella de un potencial suicidio en la Urbanización Veredas de Gurabo, en la casa núm. 458[45].

Apuntalamos que, durante el juicio, el TPI celebró un procedimiento procesal al amparo de la Regla 109 de las de Evidencia[46], a saber, ya que la defensa cuestionaba la admisibilidad del testimonio del Sgto. Rodríguez. A preguntas del juez, el Sgto. Rodríguez testificó:

> **Juez**: [...] Usted llega a la residencia.
> **Sgto. Rodríguez**: Yo llego, exacto.
> **Juez**: ¿Que usted hizo cuando llegó?
> **Sgto. Rodríguez**: Me estaciono.
> **Juez**: Ajá.
> **Sgto. Rodríguez**: Veo el carro de World Police. Que es la guardia de seguridad. Llego hasta la puerta de entrada de la casa.
> **Juez**: Ajá.
> **Sgto. Rodríguez**: Dentro de la, de la casa está la guardia de seguridad, una señora rubia de nombre Migdalia.
> **Juez**: Ajá.

---

[44] Exhibit 14 del Ministerio Público.
[45] TPO pág. 138, líneas 15-33.
[46] 32A LPRA Ap. VI.

**Sgto. Rodríguez**: Y está Juan Cabrera Eliza, que es el señor que esta aquí. Entro en la casa, desde la sala, ¿verdad? Entro por la sala. Desde la sala se ve la cocina, comedor...

**Juez**: Ujú.

**Sgto. Rodríguez**: ...porque es un "open concept".

**Juez**: Ujú.

**Sgto. Rodríguez**: Y, allá cerca de la cocina veo el cuerpo de la señora.

**Juez**: Okey.

**Sgto. Rodríguez**: Que esta como desplomada en el piso.

**Juez**: Okey.

**Sgto. Rodríguez**: Veo que tiene en el pelo una gorra blanca enredada. Y cuando me acerco pues veo que tiene como una correa negra en el cuello.

**Juez**: Okey. Y ahí...

**Sgto. Rodríguez**: Yo, como dice el abogado, yo digo, yo le digo a mi compañero, "esta no se ahorco, éste la mato". ¿Porqué?

**Juez**: [...] Okey. Y entonces...

**Sgto. Rodríguez**: Por eso...

**Juez**: ... después va y entrevista a ...

**Sgto. Rodríguez**: Y yo le digo a él, ¿Qué pasó?

**Juez**: ...a Don Juan.

**Sgto. Rodríguez**: Y él empieza a hablar.

**Juez**: Okey. Oka. ¿Alguna pregunta del Ministerio Público a las que hizo el Tribunal?

**Fiscal Díaz**: Le pregunto testigo eh, para efectos de récord, la fiscal Díaz. ¿En ese momento quien era el querellante en este caso?

**Sgto. Rodríguez**: Eh Juan Cabrera Eliza, que es el señor que está aquí.

**Fiscal Díaz**: No tenemos más preguntas Juez.

[...]

**Juez**: Este, voy hacer una pregunta, entonces por lo que escuché del testimonio, en un momento él se levanta la camisa, y enseña...

**Sgto. Rodríguez**: Si, él, él sigue hablando y él me dice, "ella me mordió en el pecho, me mordió en los labios", él se levanta la camisa, yo no le veo marcas ni en el pecho ni en los labios, como él dice[47].

[...]

El juez determinó que el testimonio es admisible, con la salvedad que los incidentes de violencia doméstica, los catalogó bajo la Regla 404 A de las de Evidencia[48] y solo podría utilizarse si la defensa abría la puerta, impugnación o bajo la Regla 404 B[49].

Luego de finalizado el proceso bajo la Regla 109 de las de Evidencia[50], el Juez emitió la siguiente instrucción al testigo Sgto. Rodríguez: ... *La segunda instrucción, tiene que ver con el testimonio que escuchamos de, del Sargento Rodríguez. Eh, se celebró una vista de admisibilidad evidenciaria y **se determinó que cualquier***

---

[47] TPO, págs. 40–42.
[48] 32 LPRA Ap. VI, R. 404.
[49] TPO, pág. 47.
[50] *Id.*

*__mención que se haya hecho entre ustedes eh referente a casos
de violencia doméstica previos, o querellas o llamadas de
violencia doméstica, no lo pueden decir cuando provean
testimonio__, porque hay una cosa que se llama "uncharged
misconduct" que quiere decir, eh casos criminales no radicados, y eso
lo hace inadmisible, en la re..la regla cuatro, cero cuatro "A" de
evidencia. Así que de eso no se puede mencionar al Jurado. Okey.*

En lo pertinente al testimonio prestado por el Sgto. Rodríguez
y el Agte. Ortiz, ambos entraron a la residencia y hallaron a la señora
Migdalia Del Valle y al señor Cabrera Eliza en el interior de esta.
Ambos agentes testificaron que pudieron observar el cuerpo desde
que entraron a la residencia.

El Sgto. Rodríguez entrevistó al apelante, mientras que el
Agte. Ortiz observaba la escena. El Agte. Ortiz le pidió a la señora
Migdalia Del Valle que se retirara del hogar, con fines de preservar
la escena[51]. De la entrevista con el Sgto. Rodríguez surge que el
señor Cabrera Eliza le contó los hechos de la siguiente forma: que
había llegado la noche anterior a su casa, había intentado acostarse
a dormir y la señora Ríos González le reclamó por una presunta
infidelidad, revisándole los genitales, propinándole golpes en el
cuerpo y mordiéndole el labio[52]. Durante su testimonio el Sgto.
Rodríguez, expresó que el señor Cabrera Eliza se levantó la camisa,
pero no pudo observar en su cuerpo moretones, marcas ni señal de
heridas[53]. Manifestó que el apelante relató que, luego de ese
intercambio con la señora Ríos González, **"...él se acuesta. Ella se
va de la casa. Él llama a los guardias de seguridad, ellos le dicen
que ella subió y volvió a bajar. Él le dice que él cerró la casa con**

---

[51] TPO, pág. 171, líneas 31-36.
[52] TPO, pág. 140, líneas 8-15.
[53] *Íd.*, líneas 23-26.

**seguro, se acostó a dormir, y al otro día cuando se levantó, la encontró muerta dentro de la casa"**[54]..

El Sgto. Rodríguez testificó que dudó de la versión ofrecida por el señor Cabrera Eliza en cuanto a la causa de muerte de la señora Ríos González, por lo cual, le manifestó al Agte. Ortiz (luego de acabada la entrevista) "está no horcó, éste la mató"[55].

El Sgto. Rodríguez declaró ... *En la marquesina había una cartera de mujer, la puerta de la marquesina estaba si seguro. Eh, la puerta que daba hacia el patio, que es un "sliding door" de cristal, tenía como un tornillo en el piso, y no permitía que se abriera. En el patio habían otras pertenencias de mujer. Me parece que eran unas gafas, y una botella de agua, pero no, no puedo precisar*[56].

Por otra parte, el Agte. Ortiz, al evaluar la escena, concluyó que lo que observaba no le resultaba compatible con la escena típica de un suicidio[57]. Ambos agentes coincidieron entre sí al considerar que la escena no aparentaba ser una de un suicidio[58].

Tras la entrevista y las observaciones iniciales, acordonaron la casa, salieron de la residencia y llamaron a Emergencias Médicas, al Centro de Investigaciones Criminales (CIC) y al Instituto de Ciencias Forenses (ICF). El Agte. Ortiz recibió a los paramédicos y les peticionó que identificaran los vitales en el cuerpo, en la medida que fuere posible, sin alterar la posición del cuerpo. Para lograr la encomienda, los paramédicos utilizaron unos "chupones" que colocaron en la espalda de la occisa, lo cual logró confirmar la ausencia de vitales, sin cambiar la posición del cuerpo[59].

---

[54] *Íd.*, líneas 42-48.
[55] TPO, pág. 141, líneas 7-15.
[56] TPO, pág. 141, líneas 41- 50.
[57] TPO, pág. 172, líneas 50-52.
[58] TPO, pág. 173, líneas 36-46.
[59] TPO, pág. 175, líneas 39-49; pág. 176, líneas 1-32. Los "chupones" utilizados se pueden apreciar en las imágenes 1690, 1693 y 1696 del Exhibit 2 del Ministerio Público.

Durante el contrainterrogatorio la representación legal del apelante abordó la temática de suicidio sin suspensión, estrangulación auto asfixia:

> **Lcdo. Moczo**: Si. Le pregunto yo a usted, ¿Cuantes escenas usted ha trabajao" en su vida, verdad, de suicidios por estrangulación, por lazo de ligadura, por la propia persona?
> **Agte. Ortiz**: Esa es la experiencia como veinte.
> **Lcdo. Moczo**: Veinte suicidios de ...
> **Agte. Ortiz**: O más.
> **Lcdo. Moczo**: ... escúcheme, de gente que se ahorcan ellos mismos, sin suspensión.
> **Agte. Ortiz**: Ellos mismos. Bueno ellos mismos si, pero...
> **Lcdo. Moczo**: Pero sin suspensión. Mire lo que les ha dicho aquí.
> **Agte. Ortiz**: ¿Sin suspensión?
> **Lcdo. Moczo**: Hay un suicidio que es por lazo, es ... estrangulación...
> **Agte. Ortiz**: No, eso...
> **Lcdo. Moczo**: ...por lazo de si... de ligadura. Que personas, por ejemplo...
> **Agte. Ortiz**: Eh ¿Qué, que se aten ellos mismo así?
> **Lcdo. Moczo**: Ellos mismos se ponen...
> **Agte. Ortiz**: No ninguno.
> **Lcdo. Moczo**: ... como, ninguno. ¿Verdad que no?
> **Agte. Ortiz**: Ninguno.
> **Lcdo. Moczo**: Ninguno.
> **Agte. Ortiz**: Ninguno, ninguno.
> **Lcdo. Moczo**: O sea que ese término de suicido por estrangulación de lazo de ligadura, usted nunca lo había oído, ni lo ha trabajado.
> **Agte. Ortiz**: Nunca lo he trabajado. Todos los suicidios que yo he ido, que es por, que, personas que se han ahorcado, o están suspendidos. O se cortan, o le cortaron los familiares la soga.
> **Lcdo. Moczo**: Le pregunto yo a usted...
> **Agte. Ortiz**: La soga por el piso.
> **Lcdo. Moczo**: ... ¿Usted sabe que es el suicidio sin suspensión, por estrangulación auto asfixia? ¿Usted sabía que existe eso? Si lo sabe.
> **Agte. Ortiz**: E... existe, pero yo nunca he estado... he tenido la experiencia de estar en una escena de esas.
> **Lcdo. Moczo**: Por tanto, si esta escena, era so... ese tipo de suicidio, usted lo desconoce, porque usted nunca lo ha trabajado.
> **Agte. Ortiz**: <u>Forense tendría que determinar eso</u>[60].

### 4.    Yaritzia Ramos Díaz (investigadora Ramos Díaz)

La investigadora Ramos Díaz testificó que para la fecha de los hechos trabajaba como Investigadora Forense para el Instituto de Ciencias Forense de Puerto Rico (ICF) y que en este caso fungió como investigadora primaria[61]. Contó que, el 29 de noviembre de 2020, entró a su turno de trabajo a las dos de la tarde; ya el caso estaba

---

[60] TPO, pág. 189, líneas 33-51; pág. 190.
[61] TPO, pág. 56, línea 1.

esperando, por lo que partió hacia el lugar de los hechos con su colega de turno, Vanessa Rivera Ayala[62]. Llegaron ambas a la Residencia Núm. 458, en donde hallaron el cuerpo de la occisa en el área de la cocina. Detalló que el cuerpo se encontraba *"en el suelo, con sus pies cruzado, el torso encima de sus pies[, l]a cabeza en el suelo[, y] sus manos debajo"*[63].

Como parte de su trabajo, la investigadora Ramos Díaz preparó un informe titulado *Informe de Hallazgos de Escena* (el Informe)[64]. Allí apuntó que estuvo en la escena desde las 2:25 pm hasta las 4:50 pm. La página 6 del *Informe* contiene una serie de imágenes con representaciones de cómo se pudiera encontrar un cadáver[65]. En la sección de las observaciones, lee: "El cuerpo de la occisa se localizó en una posición que no está en el diagrama anterior. Ésta se localizó sentada en el suelo con las piernas cruzadas, y su torso sobre las piernas, su cara sobre el suelo, sus manos debajo del cuerpo"[66]. En la página 8, plasmó en sus observaciones que: "[e]n el área del cuello tenía una especie de ligadura, esta a su vez amarrada en la parte del frente con dos (2) sujetadores. La ligadura en la parte posterior del cuello estaba pillando su cabello y la cadena plateada que tenía puesta"[67]. La página 12 del *Informe* detalla los hallazgos de la escena, los cuales incluyen unas pertenencias de la señora Ríos González, tales como una cartera "wallet" con tarjetas de identificación de esta[68]. Finalmente, el *Informe* contiene un croquis de la escena.

Del contrainterrogatorio, se destacó que la investigadora Ramos Díaz no incluyó en el *Informe* que hubiera identificado signos

---

[62] *Id.*, líneas 18-27.
[63] TPO, pág. 59, líneas 31-33.
[64] Exhibit 1 del Ministerio Público.
[65] *Id.*, en la pág. 6 (lee "POSICIÓN DEL CADÁVER AL SER LOCALIZADO POR EL INVESTIGADOR FORENSE").
[66] *Id.*
[67] *Id.*, pág. 8.
[68] *Id.*, pág. 12.

de violencia en el cuerpo de la occisa[69]. También, admitió que no se

halló ningún utensilio que hubiera permitido alterar la escena[70].

### 5.    Agente Jesús Torres Ramírez (Agte. Torres)

Antes de comenzar el interrogatorio del Agte. Torres, el

honorable juez explicó al testigo sobre la instrucción que se había

dado a varios testigos en cuanto a *"[s]i hubo incidentes de violencia*

*doméstica anteriores que tengan conocimiento, esa conducta criminal,*

*que se llama "uncharged misconduct", que no ha sido radicada ni es*

*parte de este caso. Ósea que no se puede proveer ningún testimonio,*

*ni información que haya recibido acerca de incidentes de violencia*

*doméstica, que hayan ocurrido anteriormente*[71]. Luego de atender las

argumentaciones de las partes, el TPI concluyó que no permitiría el

acceso de la orden como exhibits pero *todo lo que haya dicho el*

*acusado, que sea admisible, entiéndase que se leyeron las*

*advertencias, o que caiga en una de las excepciones, si puede hablar*

*de ello. Porque no es prueba de referencia*[72].

En síntesis, el Agte. Torres testificó que trabajaba como

investigador de la división de Homicidios de Caguas. Declaró que,

para el 1 de diciembre de 2020, fue instruido para que acompañara

al Agte. Cruz Luna a investigar un incidente sobre la muerte de una

fémina en Gurabo[73]. Para aquella fecha se reunieron con la fiscal

Ana María Martínez Orama y con el patólogo Javier Serrano, quien

se unió a la reunión mediante llamada telefónica. En esa reunión, el

Patólogo les informó que había concluido que la causa de la muerte

había sido identificada como un homicidio vía estrangulamiento por

una ligadura y no un suicidio[74]. Como resultado de lo conversado,

el Agte. Torres fue asignado para ser el agente investigador del caso.

---

[69] TPO, pág. 112, líneas 10-52 (haciendo alusión a las páginas 9 a 11 del *Informe de Hallazgos de Escena*, Exhibit 1 del Ministerio Público).
[70] TPO, pág. 113, líneas 33-37.
[71] TPO, págs. 436-437.
[72] TPO, pág. 442, líneas 36–41.
[73] TPO, pág. 445, líneas 49-52, pág. 446, líneas 1-3.
[74] TPO, pág. 447, líneas 15-21.

A partir de lo cual, este entrevistó a los empleados de *World Security* que trabajaron para las fechas de los hechos, al Sgto. Rodríguez, al Agte. Ortiz y al apelante[75]. Específicamente, el Agte. Ortiz le manifestó que la escena de los hechos no le parecía una típica de un ahorcamiento[76].

Previo a entrevistar al señor Cabrera Eliza, le hizo las advertencias *Miranda* e hizo constar por escrito que el apelante estaba renunciando a sus derechos y accediendo voluntariamente a ser interrogado[77]. La entrevista comenzó con un recuento del inicio de la relación del señor Cabrera Eliza con la señora Ríos González y con una ligera sinopsis del estado de la relación. A base de ese diálogo, el Agte. Torres testificó que el señor Cabrera Eliza le manifestó que:

> **AGTE. TORRES**: [...] ella empieza a tener unos problemas según él. De que estaba faltando al trabajando, estaba llegando tarde. Comenzó a llegar tarde a la casa. Eh la relación que ellos estaban teniendo, y comienza a tener problemas. Dentro de estos problemas, hubieron unas situaciones, donde tuvieron que sacar órdenes de protección. Tuvieron unos casos por ley cincuenticuatro. Tuvieron que intervenir la policía en varias ocasiones. Ya que él alegaba que tuvo querella en contra de ella, y ella en contra del, referente a unas agresiones. En algún momento a él lo sacan de la casa, de, de Veredas. Este, por una ley cincuenticuatro, se queda ella. Posteriormente él hace una querella porque ella le lleva, un vehículo que él tiene[78].

Además, el Agte. Torres testificó que, sobre la noche de los hechos, el apelante le expresó lo siguiente:

> **AGTE. TORRES**: [...] él me indica que él llega a la casa como a las diez de la noche, que cuando él llega a casa, comienza una discusión entre Tania, indicándole que "donde carajo él estaba, que con que puta estaba, que por que había llegado a esa hora". Posteriormente le dice que lo dejara quieto, él lo que quería era acostarse a dormir. Continua la discusión dentro de la casa. En algún momento él llega a la habitación, cuando está en la habitación, él indica que Tania se le tira encima queriéndole bajar el zíper del pantalón, y él empieza un forcejeo con ella, hasta que logra sacársela de encima.

---

[75] Específicamente, entrevistó a: Karl Marie Ortega Calderón, Jorge Luis del Valle y Migdalia del Valle Cruz. Los detalles que estos le revelaron concuerdan con sus testimonios orales vertidos en el juicio. Para la entrevista de la Sra. Ortega Calderón, *véase* TPO, pág. 451-452; para la entrevista del Sr. del Valle, véase TPO, págs. 470-484; para la entrevista de la Sra. Migdalia del Valle, *véase* TPO, págs. 484-485.

[76] TPO, pág. 487.

[77] Exhibit 13 del Ministerio Público.

[78] TPO, pág. 493, líneas 33-52; pág. 494, líneas 1-13.

Posteriormente él dice que Tania le comenzó a dar golpes, que él se tapó, con sus manos y él intenta llamar y que, a la Policía, la Policía y que no contesta. Y, posteriormente llama a los guardias de seguridad para que la saquen de la urbanización.

**Fiscal Rivera**: ¿Qué información si alguna le da él de lo que ocurre luego de que él hace esas gestiones con los guardias de seguridad, pa' que la saquen de allí?

**AGTE. TORRES**: Pues posteriormente él indica que Tania sale de la, de la residencia. Que se va por la parte de atrás, y que le sigue hablando improperios, ¿Verdad? "hijo'e puta, te las he pegao' treinta veces." "Que tu mai' este, está cansá'." Sae', que está cansá de él. Que, sigue, hablando por fuera de la residencia, hasta que posteriormente llegan los guardias de seguridad, y que él le indica que la saquen de, de la urbanización. Y le, ¿Verdad? y él, y él intenta y que intentó en varias ocasiones llamar la Policía, y llamar la guardia de seguridad, para que la sacaran de allí. Que posteriormente ella se queda afuera de la residencia, se quedó en el área de la marquesina, y que él se acuesta a dormir, se queda, cierra la casa, y se, sae' se queda dentro de la casa, se acuesta a dormir, y que, por la mañana cuando él se levanta, él la ve, en el área de la cocina, en el piso[79].

En cuanto a las llamadas que el Sr. Cabrera Eliza indicó durante la entrevista que él había realizado, el Agte. Torres testificó que pudo corroborar las llamadas a la caseta, pero no las llamadas realizadas a la policía[80]. Al finalizar la entrevista, el Agte. Torres hizo entrega al señor Cabrera Eliza de una orden de allanamiento, la cual autorizaba la toma de una muestra bucal[81].

El 17 de marzo de 2021, el Agte. Torres se reunió con el Dr. Serrano, quien le reafirmó sus hallazgos. Estos fueron los siguientes: <u>que la causa de muerte fue por estrangulación por ligadura, que no había puntos de suspensión, y que el cuerpo de la occisa tenía un sangrado interno en el área de la cabeza, el cual era compatible con un golpe</u>[82]. El 22 de diciembre de 2022, el Agte. Torres volvió a reunirse con el Dr. Serrano, el cual le reiteró sus determinaciones. El Agte. Torres concluyó su testimonio resaltando que, conforme a su investigación, las únicas dos personas dentro de

---

[79] TPO, pág. 496, líneas 10-52; pág. 497, líneas 1-3.
[80] TPO, pág. 497, líneas 17-51.
[81] TPO, pág. 498, líneas 32-52; pág. 499, líneas 1-8. Exhibit 7 del Ministerio Público.
[82] TPO, pág. 502, líneas 16-25.

la residencia la noche de los hechos fueron la señora Ríos González y el señor Cabrera Eliza[83].

Como parte del contrainterrogatorio, el Agte. Torres testificó que, dentro de su investigación, llegó a discutir con la fiscal el récord psiquiátrico de la señora Ríos González[84]. Según sus respuestas, surge que los récords identificaban que la señora Ríos González había intentado suicidarse en varias ocasiones, incluyendo un intento con una camisa[85]. Estos récords no se discutieron con el patólogo del caso, el Dr. Serrano[86]. Tampoco fueron marcados como prueba documental por alguna de las partes. Además, afirmó que la señora Ríos González tenía una acusación por haber mordido a un policía[87].

### 6.    Windalyz Torres Santiago (analista Torres Santiago)

La Sra. Windalyz Torres Santiago era analista de ADN del ICF para la fecha de los hechos. Ella preparó el Certificado de Análisis Forense de ADN: DNAS-20-0822 (enmendado)[88]. Este informe presenta dos conclusiones centrales: (1) que, del raspado de uñas de la mano izquierda de la occisa, no se puede excluir que el material genético haya venido del señor Cabrera Eliza y de la señora Ríos González y; (2) que, de los aplicadores de la ligadura, el señor Cabrera Eliza quedó excluido de ser el donante del material genético hallado en la pieza[89].

### 7.    Dr. Javier Gustavo Serrano Serrano (Dr. Serrano)

El Dr. Serrano fue el patólogo forense del ICF que realizó la autopsia del cuerpo de la señora Ríos González, cuando le fue asignado el caso el 30 de noviembre de 2022[90]. Este relató que

---

[83] TPO, pág. 503, líneas 9-12.
[84] TPO, pág. 552, líneas 39-43.
[85] TPO, pág. 560, líneas 34-7; pág. 561, líneas 9-12.
[86] TPO, pág. 567, líneas 6-21.
[87] TPO, pág. 565, líneas 43-54; pág. 566, líneas 1-19.
[88] Exhibit 12 del Ministerio Público. Para ver la versión del informe previo a las enmiendas, *véase* Exhibit 1 de la Defensa.
[89] *Id.*, págs. 3-4.
[90] TPO, pág. 621, líneas 33-39.

documentó el proceso seguido mediante la toma de fotografías y la redacción de un informe[91]. En su testimonio, describió el estado en el cual el cuerpo de la occisa llegó a donde él, con las manos cubiertas con papel de estraza[92]. Detalló que la occisa tenía una correa ceñida al cuello, la cual le daba tres vueltas y terminaba en la parte anterior del cuello[93]. Al destapar las manos cubiertas, observó que el brazo derecho de la occisa había sostenido una "abrasión alargada", lo cual era presencia de trauma[94].

Como parte del procedimiento, este observó que la ligadura se encontraba más suelta a la parte posterior del cuello y que el cabello de la occisa se encontraba dentro de la ligadura[95]. Notó que había espacio —aunque leve— entre la ligadura y el cuello, lo cual le indicaba que la correa de por sí no estaba en la posición para ejercer "presión dramática" sobre el cuello[96]. Analizando la posición de la ligadura y las impresiones que dejó sobre el cuello de la occisa, concluyó que en este caso no hubo un punto de suspensión[97].

Además, destacó que, en el interior del labio de la occisa, se pudo apreciar "áreas de contusión", las cuales pudieron haber sido producto de un golpe[98]. Detectó unos "infiltrados hemorrágicos" en el cráneo, los cuales son "presencia de traumas" o "golpes en esa región de la cabeza"[99]. Por la ausencia de lesiones externas, al Doctor Serrano le parecieron compatibles con golpes dados contra una superficie.

---

[91] Exhibit 15 (fotografías de patología) y Exhibit 16 (informe médico-forense). El informe médico-forense fue preparado el 21 de marzo de 2022.

[92] TPO, pág. 633, líneas 29-49; Exhibit 12, imagen 1112. El Dr. Serrano explicó que la cobertura de las manos servía para conservar cualquier evidencia de material genético que pudo haber sido transferido a las manos de la víctima; *véase* TPO, pág. 634, líneas 5-17.

[93] TPO, pág. 634, líneas 35-52; pág. 635, líneas 1-2. Ver también Exhibit 12 del Ministerio Público, imagen 1115.

[94] TPO, pág. 635, líneas 8-15, 24.

[95] TPO, pág. 637, líneas 47-52; pág. 638, líneas 1-4 ("est[á] ligeramente laxa).

[96] TPO, pág. 640, líneas 7-45.

[97] TPO, pág. 641, líneas 4-5.

[98] *Íd.*, líneas 38-52.

[99] TPO, pág. 645, líneas 5-22.

Al culminar con la disección de los músculos del cuello, observó la presencia de infiltrados hemorrágicos en la "parte inferior del lado derecho del cuello"[100]. Un análisis de la región lo llevó a concluir que la ligadura estaba ejerciendo presión debido a una fuerza que halaba en dirección a la parte posterior del cuerpo. Esta fuerza, explicó el galeno, llevó a que la ligadura ejerciera mayor presión en el cuello, así detalló el cuadro ante él[101].

A preguntas del Ministerio Público, el Dr. Serrano **opinó que posiblemente los golpes ocurrieron primero, y luego la estrangulación[102]. Partiendo de esta premisa, afirmó que sería imposible que una persona que hubiere sufrido un golpe de la magnitud descrita —capaz de provocar un infiltrado hemorrágico en el cráneo— tuviera las fuerzas para ejercer la presión sobre la ligadura, tal y como se observó[103].** Es decir, descartó el escenario de que la estrangulación fuera autoinfligida. Finalizada la autopsia, concluyó que la causa de muerte fue una estrangulación por ligadura, por lo que la muerte se clasificaba como *homicidio*[104]. Así lo dejó plasmado en el Informe Médico–Forense, PAT-5256-20 que suscribió[105].

En el contrainterrogatorio, el Dr. Serrano admitió que, en el testimonio narrado en sala durante el juicio llevó a cabo varias observaciones que había omitido en su informe y en la Vista Preliminar. Una de tales omisiones fue la observación del espacio entre el cuello de la occisa y la ligadura[106]. Tampoco había hecho mención previa de la lesión en el antebrazo derecho[107]. Igual, aceptó que la causa de la laceración observada en el brazo de la occisa era

[100] TPO, pág. 646, líneas 16-24.
[101] TPO, pág. 647, líneas 12-50; pág. 648, líneas 10-23.
[102] TPO, pág. 648, línea 34.
[103] TPO, pág. 648, líneas 49-52; pág. 649, líneas 1-5.
[104] TPO, pág. 650, líneas 43-47.
[105] Exhibit 16 del Ministerio Público, pág. 8.
[106] TPO, pág. 670, líneas 6-33.
[107] TPO, pág. 671, líneas 1-13.

inconclusa[108]. El Dr. Serrano afirmó que no había hecho mención previa del golpe en la cabeza que había observado, ni de las posibles causas de este[109]. Finalmente, el Dr. Serrano admitió que las inferencias en cuanto a que la fuerza se había ejercido de la parte posterior no las había comentado hasta el día del juicio[110].

Cabe destacar que, a preguntas de la defensa, en el contrainterrogatorio del Dr. Serrano, surgieron dos asuntos adicionales: 1) que sí era posible el suicidio por auto asfixie, y este sin punto de suspensión[111]; 2) en el caso de la señora Ríos González no hubo fractura del hueso hioides, lo cual resulta compatible con un caso de suicidio o estrangulamiento por ligadura[112].

Por otra parte, destacamos que la defensa tuvo amplia oportunidad de contrainterrogar a cada uno de los testigos. Además, el apelante ejerció su derecho a no presentar prueba, y el caso quedó sometido por las partes.

Es así como, el 17 de diciembre de 2025, el jurado rindió un veredicto de culpabilidad por unanimidad por infracción al Artículo 93(a) del Código Penal de Puerto Rico[113], el cual fue aceptado por el foro apelado. Así pues, el 18 de febrero de 2025, el TPI emitió la sentencia apelada, imponiéndole al apelante una pena de noventa y nueve (99) años de cárcel.

Inconforme, el apelante acudió ante nos mediante el recurso de apelación de epígrafe y señaló la comisión de los siguientes errores:

**Primer error:**
El Ministerio Público no presentó prueba suficiente para derrotar la presunción de inocencia que cobija al apelante durante todo el proceso en su contra.

---

[108] TPO pág. 671, líneas 8-40.
[109] TPO pág. 673, líneas 3-27; pág. 674, líneas 16-21.
[110] TPO pág. 676, líneas 13-20.
[111] TPO pág. 676, líneas 30-52; pág. 677, líneas 1-17.
[112] TPO pág. 683, líneas 29-51; pág. 684, líneas 1-12.
[113] *Supra.*

**Segundo error:**
Erró el juzgador de hechos al emitir un veredicto de culpabilidad cuando no se probó la culpabilidad más allá de duda razonable.

**Tercer error:**
El Ministerio Público no presentó prueba suficiente de los elementos del delito para rebatir la presunción de inocencia.

**Cuarto error:**
El Ministerio Público no estableció la conexión del acusado con el delito por el cual fue encontrado culpable, ni de la intención criminal del imputado en la comisión del delito.

**Quinto error:**
El juzgador cometió un error claro y manifiesto al analizar la prueba siendo la prueba una insuficiente para derrotar la presunción de inocencia.

Luego de que accediéramos a varias solicitudes de prórroga para permitir que el recurso fuese perfeccionado, y atendidos algunos asuntos relacionados con los métodos de la reproducción de la prueba oral, el apelante presentó su *Alegato* el 14 de octubre de 2025.

Por su parte, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General (Procurador), presentó el *Alegato del Pueblo de Puerto Rico* el 13 de noviembre de 2025.

Con el beneficio de la comparecencia de las partes, así como de la transcripción de la prueba oral vertida en el juicio, estamos en posición de resolver.

## II.

### -A-

El Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico, consagra el derecho de todo acusado de delito "a gozar de la presunción de inocencia"[114]. De igual forma, la Regla 110 de Procedimiento Criminal[115], establecen que, en todo proceso "se presumirá inocente el acusado mientras no se probare lo contrario y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá". Lo anterior se basa en que, para rebatir la presunción

---

[114] Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1.
[115] 34 LPRA Ap. II, R. 110.

de inocencia, "el ordenamiento jurídico requiere la presentación de evidencia que establezca la culpabilidad del acusado más allá de duda razonable"[116].

"La máxima que rige nuestro ordenamiento a los fines de que la culpabilidad de una persona que ha sido acusada de delito sea demostrada con prueba suficiente y más allá de toda duda razonable, es consustancial con la presunción de inocencia y constituye uno de los imperativos del debido proceso de ley"[117]. Por ello, es al Estado a quien le corresponde la obligación de presentar evidencia y cumplir con la carga de la prueba para establecer la culpabilidad del acusado. "Dicho de otro modo, el acusado no tiene obligación alguna de aportar prueba para defenderse; más bien, puede descansar plenamente en la presunción de inocencia que le asiste"[118].

Cónsono con lo anterior, es el Estado quien deberá presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado[119]. Tal obligación no es susceptible de ser descargada livianamente pues no basta que el Estado presente prueba que meramente verse sobre cada uno de los elementos del delito imputado, o prueba suficiente. Es necesario que la prueba presentada, además de ser suficiente, sea satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación[120].

La "duda razonable no es una duda especulativa o imaginaria, como tampoco lo es cualquier duda posible. 'Duda razonable' es aquella duda fundada que surge como producto del raciocinio de

---

[116] *Pueblo v. Martínez Toro*, 200 DPR 934, 855-6 (2018). Ver también, *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146 (2020).
[117] *Pueblo v. Irizarry*, *supra*, pág. 786 (2002); *Pueblo v. León Martínez*, 132 DPR 746, 764 (1993).
[118] *Pueblo v. Irizarry*, *supra*, pág. 787.
[119] *Pueblo v. Martínez Toro*, *supra*, pág. 892.
[120] *Pueblo v. Arlequín Vélez*, *supra*, pág. 146; *Pueblo v. Irizarry*, *supra*, en la pág. 787.

todos los elementos de juicio involucrados en el caso. Para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación"[121].

**-B-**

La Regla 110(H) de las Reglas de Evidencia[122] establece que:

> Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. ... Evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Como ha establecido el Tribunal Supremo, "la evidencia circunstancial es intrínsecamente igual que la evidencia directa"[123]. Esta incluso puede ser, en palabras del Tribunal Supremo de los Estados Unidos, "más certera, satisfactoria y persuasiva que la evidencia directa"[124], (traducción suplida). Al tener el mismo peso ambas categorías de prueba, se desprende que "el Estado puedo demostrar la culpabilidad de un imputado de delito ... mediante evidencia directa o por medio de evidencia circunstancial"[125]. Es decir, no hay impedimento constitucional ni estatutario a que la presunción de inocencia se pueda rebatir con prueba indirecta.

La prueba indirecta o circunstancial, como establece la Regla 110(H), *supra*, permite al juzgador inferir el hecho en controversia. Esta "se funda en inferencias razonables que hace el juzgador a partir de la evidencia presentada por las partes"[126]. Así pues, se ha establecido que la característica fundamental de la prueba

---

[121] *Pueblo v. Irizarry, supra*, pág. 788 (citas omitidas). Véase también: *Pueblo v. Toro Martínez, supra*, en la pág. 856; *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985); *Pueblo v. Cruz Granados*, 116 DPR 3, 22 (1984).

[122] 32 LPRA Ap VI, R. 110.

[123] *Zambrana v. Hospital Santo Asilo de Damas*, 109 DPR 517, 520 (1980); *Krans v. Santarrosa*, 172 DPR 731, 746-747 (2008).

[124] *Desert Palace v. Costa*, 539 U.S. 90, 100 (2003)

[125] *Pueblo v. Gómez Nazario*, 121 DPR 66, 72 (1988).

[126] Ernesto L. Chiesa Aponte, *Compendio de Evidencia*, Tirant lo Blanch, 2021, pág. 745.

circunstancial es que, aunque fuera creída, no es suficiente para probar el hecho que aspira probar[127]. Por ello, la evidencia circunstancial que sirva como fundamento para establecer un hecho, debe poder llevar al juzgador a concluir la existencia del hecho mediante inferencias razonables. Por ejemplo, no sería necesario que se presente prueba de que un testigo observó expresamente un hecho, si de las circunstancias que pudo presenciar se puede inferir razonablemente[128].

**-C-**

El artículo 92 del Código Penal de Puerto Rico[129], establece que "[a]sesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". Acto seguido, la ley establece las circunstancias bajo las cuales este delito se considerará asesinato en primer grado. Lee el Código en el artículo 93: "[c]onstituye asesinato en primer grado: (a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, *estrangulamiento*, sofocación o asfixie posicional, o a propósito o con conocimiento"[130]. (énfasis suplido). Al incorporar la definición del Artículo 92, *supra*, al articulado de los asesinatos en primer grado, el Código Penal está estableciendo que, cuando se comete un asesinato—se cause la muerte de un ser humano a propósito con conocimiento o temerariamente—en conjunto con alguna de las circunstancias concomitantes enumeradas, el delito cometido será el del primer grado.

En el caso del inciso (a) del artículo 93, se prescinde de probar propósito o conocimiento (según definidos en el artículo 22 del Código) para toda la muerte perpetrada por estrangulación. Esta modalidad es producto de una enmienda reciente, la cual añade la estrangulación a la lista de conductas (que incluía veneno, acecho o

---

[127] *Admor. F.S.E. v. Almacén Ramón Rosa*, 151 DPR 711, 719 (2000).
[128] *Pueblo v. Guadalupe Rivera*, 2021 TSPR 32, en la pág. 31.
[129] 33 LPRA sec. 5141.
[130] 33 LPRA sec.5142.

tortura) las cuales son actos que implican de por sí propósito o conocimiento[131]. Cuando se comete un asesinato mediando una de esas circunstancias, el delito es catalogado como de primer grado *por la mera conducta*[132]. ("El uso de estos medios para causar el asesinato presupone estados mentales de propósito o conocimiento"). Es decir, al alegar que el delito es asesinato en primer grado **bajo el artículo 93(a) en su modalidad de estrangulamiento, el Ministerio Público tiene que probar: que se cometió un asesinato, mediante estrangulamiento (en conjunto con el nexo causal)**[133].

**-D-**

Nuestro Máximo Foro ha indicado que la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación, dado a que "la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y de derecho"[134]. Sin embargo, precisamente porque la apreciación de la prueba corresponde al foro sentenciador, los tribunales apelativos solamente intervendrán con ella cuando concurran determinadas circunstancias que lo justifiquen. En otras palabras, al enfrentarnos con la tarea de revisar cuestiones relacionadas a convicciones criminales, siempre nos hemos regido por la norma de autolimitación que establece que la apreciación de la prueba

---

[131] Ley Núm. 71-2024; *véase* Dora Nevares-Muñiz, *Código Penal de Puerto Rico Comentado*, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 156-7, (comentando las modalidades de veneno, acecho y tortura).

[132] *Id.*

[133] El Código Penal define estrangulamiento en el artículo 14 de la siguiente forma:
[T]odo acto que sin su consentimiento limite o impida la respiración o la circulación de la sangre de una persona mediante la aplicación de presión en su garganta o cuello, independientemente si dicha conducta produce una lesión visible o provoca un daño prolongado a la víctima. El estrangulamiento se divide en tres categorías principales: suspensión o ahorcamiento, estrangulamiento con ligadura y estrangulamiento manual. ...
Estrangulamiento con ligadura también llamada garrote – significa el estrangulamiento que se hace mediante la envoltura de un objeto flexible como una cuerda, alambre o cordones de zapatos de manera parcial o totalmente alrededor del cuello y tirar de el con fuerza en el área de la garganta o el cuello. 33 LPRA sec. 5014.

[134] *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

corresponde, en primera instancia, al foro sentenciador. Habida cuenta de ello, los tribunales apelativos solo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto[135]. Solo ante la presencia de estos elementos y/o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble habremos de intervenir con la apreciación efectuada. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000) y casos allí citados; *Pueblo v. Irizarry, supra*, págs. 788-9.

Así, la función revisora del Tribunal de Apelaciones en casos penales consiste en evaluar si se derrotó la presunción de inocencia del acusado, y si su culpabilidad fue demostrada por el Estado luego de haberse presentado "prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este último[136]." Esto sin olvidar que el referido proceso analítico tiene que estar enmarcado, por imperativo constitucional, en el principio fundamental de que la culpabilidad del acusado debe ser probada más allá de toda duda razonable[137]. Además, la revisión se hará a la luz de la norma imperante en nuestro ordenamiento jurídico de conceder deferencia al juzgador de los hechos, sea juez o jurado. Dicha norma se fundamenta en el principio de que son los foros primarios los que están en mejor posición para evaluar la prueba presentada, debido a que tienen la oportunidad de observar y escuchar los testigos, aquilatar el testimonio de éstos y adjudicar la credibilidad que el mismo le haya merecido[138]. Ello, "se debe a que es el juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos,

---

[135] *Pueblo v. Toro Martínez*, 200 DPR 834, 858 (2018); *Pueblo v. García Colón I*, 182 DPR 129, 165-6 (2011); *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 63 (1991).
[136] *Pueblo v. Acevedo Estrada, supra*, pág. 99.
[137] *Pueblo v. Irizarry, supra*, pág. 789.
[138] *Pueblo v. Cabán Torres*, 117 DPR 645, 654 (1986).

dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad"[139].

En cuanto a la importancia de conceder deferencia al juzgador de los hechos, sea el juez o el jurado, y acerca de la abstención de los tribunales apelativos de intervenir con la apreciación de la prueba, en *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975), el Tribunal Supremo de Puerto Rico expresó lo siguiente:

> La verdad es que el testigo debe ser oído, y visto, interrogado y mirado. ... [y] es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación.

Por tanto, es el juzgador de los hechos quien determina la credibilidad que le merezca la prueba, basado en una valoración de la certeza o probabilidad sobre la versión de unos hechos o acontecimientos en controversia[140]. Ante ello, incuestionablemente, los jueces de primera instancia y el jurado están en mejor posición que los foros apelativos para aquilatar la prueba oral[141]. Estos tienen la ventaja de ver y escuchar directamente a los testigos y, por ello, sus determinaciones sobre credibilidad merecen gran respeto[142].

En vista de ello, no procede nuestra intervención con la apreciación y adjudicación de credibilidad que haga el jurado en cuanto a la prueba testifical a menos que su examen sereno, detallado y desapasionado produzca en nuestro ánimo insatisfacción o intranquilidad de conciencia[143]. Es decir, aun

---

[139] *Pueblo v. García Colón I, supra*, pág. 165.
[140] *Pueblo v. Colón, Castillo*, 140 DPR 564, 578 (1996).
[141] *Pueblo v. Torres Rivera*, 129 DPR 331, 342-343 (1991).
[142] *Pueblo v. Santiago*, 176 DPR 133, 148 (2009).
[143] *Pueblo v. Ramos Miranda*, 140 DPR 547, 549 (1996).

cuando nuestra facultad revisora está limitada por la deferencia que merece el juzgador de los hechos, ello no implica que este foro no pueda intervenir y revocar un fallo condenatorio cuando estemos convencidos que de un análisis integral de la prueba no se demuestre la culpabilidad del acusado más allá de duda razonable[144]. *Pueblo v. Acevedo Estrada*, supra, pág. 101. Partiendo de lo expresado, los tribunales apelativos no intervendremos con la apreciación de la prueba del foro sentenciador a menos que exista error manifiesto, pasión, prejuicio o parcialidad.

### III.

Los errores señalados por el apelante son susceptibles de discusión en conjunto y así los atenderemos. El apelante aduce que el TPI incide al declararlo culpable del delito de asesinato en primer grado y cuestiona la valoración de la prueba desfilada. En ese sentido, sostiene que no se establecieron los elementos constitutivos del delito de asesinato en primer grado y que la prueba presentada por el Estado no demostró, más allá de duda razonable, que cometió el delito por el cual fue convicto.

Iniciamos por afirmar que, estudiada la prueba que estuvo ante la consideración del Jurado y del TPI, nos resulta claro que fue suficiente en derecho para probar, más allá de duda razonable, cada uno de los elementos del delito por los cuales el apelante fue encontrado culpable.

Como destacáramos anteriormente, los elementos del delito del asesinato en primer grado, según configurados en el Artículo 93(a), son: un asesinato mediante estrangulamiento (entre otras de las posibles circunstancias). Quiérase decir, que **bajo el Artículo 93(a), en su modalidad de estrangulamiento, el Ministerio**

---

[144] *Pueblo v. Irizarry, supra,* págs. 788-789.

**Público tiene que probar: que se cometió un asesinato, mediante estrangulamiento (en conjunto con el nexo causal)**[145].

Veamos cómo la prueba nos lleva a la conclusión de que los elementos del delito estaban presentes en este caso.

En el juicio celebrado, se desfiló prueba indudable de que la mañana del 29 de noviembre de 2020 se halló el cuerpo de la señora Ríos González sin vida en la Residencia Núm. 458 de la Urbanización Veredas, en Gurabo, Puerto Rico. Allí, hubo la muerte de una persona.

Cabe preguntarnos, ¿Fue perpetrada la muerte mediante estrangulación? Para contestar dicha interrogante, fiscalía sentó al Dr. Serrano, médico patólogo, quien, mediante su informe escrito y su testimonio, confirmó que la causa de la muerte había sido "estrangulación por ligadura" y que la muerte se clasificaba como homicidio y no suicidio. De esas conclusiones, la defensa no impugnó que la muerte haya sido causada mediante una estrangulación por ligadura.

Además, en la prueba sobreabundan demostrativos del estado del cuerpo de la occisa y del instrumento que le causó la muerte. Las fotografías son bastas y revelan la ligadura (también descrita como correa) atada al cuello del cuerpo.

La defensa cuestionó el testimonio del Dr. Serrano y trató de colocar en entredicho la teoría presentada por el Ministerio Público en cuanto a la forma de muerte de la señora Ríos González; es decir,

---

[145] El Código Penal define estrangulamiento en el artículo 14 de la siguiente forma:
   [T]odo acto que sin su consentimiento limite o impida la respiración o la circulación de la sangre de una persona mediante la aplicación de presión en su garganta o cuello, independientemente si dicha conducta produce una lesión visible o provoca un daño prolongado a la víctima. El estrangulamiento se divide en tres categorías principales: suspensión o ahorcamiento, estrangulamiento con ligadura y estrangulamiento manual. ...
   Estrangulamiento con ligadura también llamada garrote – significa el estrangulamiento que se hace mediante la envoltura de un objeto flexible como una cuerda, alambre o cordones de zapatos de manera parcial o totalmente alrededor del cuello y tirar de el con fuerza en el área de la garganta o el cuello. 33 LPRA sec. 5014.

si fue homicidio o suicidio, así como esbozó que el patólogo expone una teoría nueva durante el juicio[146].

Tras revisitar la transcripción de la prueba, es un hecho cierto que el testimonio del Dr. Serrano cumple con las exigencias de las Reglas 702 y 703 de las de Evidencia[147]. Es decir, el testimonio fue admitido, posee un conocimiento científico, técnico o especializado en la materia sobre la cual presta testimonio, confiable y de ayuda al juzgador para entender, evaluar y decidir la evidencia en relación con los hechos en controversia. Además, conforme la Regla 704 de las de Evidencia[148], su opinión e inferencias están basadas en hechos o datos percibidos por ella o dentro de su conocimiento personal o informados a ella antes de o durante el juicio o vista.

A su vez, la Regla 705 de las de Evidencia[149], en lo pertinente, dispone como sigue:

> No será objetable la opinión o inferencia de un perito por el hecho que se refiera a la cuestión que finalmente ha de ser decidida por el juzgador.

Fíjese que, el profesor Chiesa Aponte, al comentar la Regla 705 de las de Evidencia expone que, **hoy día la regla es admitir la opinión pericial sobre la cuestión última**, recordando que el testimonio pericial es admisible siempre que sea de ayuda al juzgador[150]. A su vez, la Regla 706 de las de Evidencia[151] dispone sobre la revelación de la base para la opinión de la persona perita:

> La persona perita puede declarar sobre sus opiniones o inferencias y expresar las razones que las fundamentan **sin haber declarado antes sobre los hechos o datos en que sus opiniones o inferencias están basadas, salvo que el Tribunal lo requiera.** En todo caso, se le podrá requerir a la persona perita que revele los hechos. (Énfasis suplido).

Conforme los principios evidenciarios, el valor del testimonio pericial del Dr. Serrano fue adjudicado por el jurado. Estos

---

[146] TPO, pág. 681, líneas 24-29.
[147] 34 LPRA, Ap. IV R. 702, 703.
[148] 34 LPRA, Ap. IV R. 704.
[149] 34 LPRA, Ap. IV R. 705.
[150] Ernesto Luis Chiesa Aponte, *Práctica Procesal Puertorriqueña*, San Juan, Pubs, JTS., 1985, Evidencia - Vol. I, págs. 249-251.
[151] 34 LPRA, Ap. IV R. 706.

entendieron que brindó suficientes garantías de confiabilidad y admisibilidad para emitir un veredicto de culpabilidad.

Por otro lado, no existe duda que hubo una muerte perpetrada por estrangulamiento, prosigue la interrogante del nexo causal: ¿fue el señor Cabrera Eliza quien le causó la muerte a la señora Ríos González mediante estrangulamiento? Para contestar este particular, debemos de acudir a la evidencia circunstancial desfilada durante el juicio. Destacamos que la prueba que vincula al señor Cabrera Eliza a la muerte es circunstancial, que es **aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual -en unión a otros hechos ya establecidos- puede razonablemente inferirse el hecho en controversia**[152]. Lo determinante es si la prueba desfilada permite la inferencia del hecho propuesto: que el Sr. Cabrera Eliza asesinó a la Sra. Ríos González. Veamos.

El cuerpo de la señora Ríos González fue hallado en la Residencia Núm. 458, la cual pertenecía al apelante. La prueba nos muestra que la señora Ríos González, quien era la pareja sentimental del señor Cabrera Eliza, llevaba varias semanas viviendo con este. Según las declaraciones del apelante al Agte. Torres, investigador del caso, estos habían tenido unas semanas tumultuosas previo a la noche de los hechos. Los testimonios, en conjunto, nos narran una historia que comienza la noche del 28 de noviembre de 2020. En aquella noche, la señora Ríos González y el señor Cabrera Eliza habían tenido varias discusiones, entre las nueve y diez de la noche, cuando el apelante regresó de su empleo y fue confrontado. Los testimonios de los diversos empleados de seguridad de la Urbanización Veredas confirman que el señor

---

[152] 32 LPRA Ap. VI, R. 110(H).

Cabrera Eliza realizó varias llamadas a la caseta esa noche, para que se removiera a la señora Ríos González de la residencia.

En particular, el señor Del Valle testificó que dio varias rondas por la residencia y tuvo diversas interacciones con ambos. Expuso que, en la segunda ronda que dio por la casa observó al señor Cabrera Eliza, quien salió y le expresó que la señora Ríos González lo había mordido. En esa interacción, el apelante le suplicó que se llevara a la señora Ríos González, a lo cual el señor Del Valle se rehusaba, por no gozar de autorización para hacerlo. Al final de este intercambio, el señor Cabrera Eliza le manifestó que ellos serían responsables de pasarle algo a la señora Ríos González. En otra de las rondas que dio por la residencia, ya en la madrugada del 29 de noviembre, observó al señor Cabrera Eliza en la entrada de la casa y a la señora Ríos González en la marquesina. En esa instancia, el señor Cabrera Eliza volvió a solicitar que la removieran del hogar, a lo cual el señor Del Valle le contestó en la negativa, porque no tenía autorización para realizar lo solicitado, y que el señor Cabrera Eliza debía llamar a la policía. En ese momento, el apelante le manifestó que se acostaría a dormir y que dejaría a la señora Ríos González afuera, y les reiteró la advertencia de que la responsabilidad recaería sobre ellos, de algo ocurrir.

El señor Del Valle declaró que pasó por la residencia al menos dos veces más. En la primera ocasión, volvió a observar a la señora Ríos González en la marquesina; en la segunda, no la volvió a ver. Los testimonios detallan que en la mañana siguiente el señor Cabrera Eliza llamó a la caseta para que removieran a la señora Ríos González, quien se encontraba inconsciente. Según las distintas versiones vertidas por el propio señor Cabrera Eliza a los empleados de seguridad y al agente investigador, este se levantó y la encontró sin vida.

Además, a estos testimonios, que ubican al apelante dentro de la residencia a la hora de la muerte, y que aluden a que fue la única otra persona allí, el testimonio del Dr. Serrano también aportó a la explicación de cómo pudo haberse causado la muerte de la señora Ríos González. Este explicó que sus hallazgos en la autopsia lo llevaron a concluir que la muerte se produjo por un golpe en el área de la cabeza, seguido por una fuerza que halaba la ligadura hacia la parte posterior del cuerpo (hacia atrás), estrangulando así a la víctima. Cabe destacar que esta explicación surgió en primera instancia en el juicio, pues fue el momento en que el patólogo adujo esto por primera vez, sin haberlo incluido en su informe ni en su declaración en la Vista Preliminar, como bien señala la defensa. Sin embargo, esta contención del apelante no nos persuade porque la Regla 704 de las de Evidencia, permite las opiniones o inferencias de una persona como testigo pericial y estas pueden estar basadas en hechos o datos percibidos por ella o dentro de su conocimiento personal o informados a ella **antes de o durante el juicio o vista**[153].

Al repasar los hechos circunstanciales, colegimos que la conclusión a la cual llegó el jurado fue razonable. La prueba demuestra que la señora Ríos González falleció en algún momento de la madrugada del 29 de noviembre de 2020, mediante una estrangulación, producto de que otra persona ejerciera fuerza sobre la ligadura, y que la única otra persona dentro de la residencia era el señor Cabrera Eliza, con quien había tenido una pugna horas antes. Al tomar los hechos en conjunto, resulta viable que el jurado haya considerado esa información y concluido que quien causó la muerte fue el señor Cabrera Eliza.

El apelante también señaló que no se probó "la intención criminal del imputado en la comisión del delito"[154]. Ciertamente no

---

[153] 32 LPRA Ap. VI, R. 704.
[154] Artículo 21 del Código Penal, 33 LPRA sec. 5034.

puede haber responsabilidad penal en ausencia de un estado mental criminal. No obstante, conviene repasar que "[e]l elemento subjetivo del delito se manifiesta por **las circunstancias relacionadas con el hecho**, la capacidad mental, **las manifestaciones y conducta de la persona**"[155]. (Énfasis suplido). Además, el Tribunal Supremo ha resuelto que el elemento subjetivo es susceptible a ser probado por evidencia indirecta[156].

Por los hechos anteriormente reseñados, somos del criterio que el Ministerio Público probó más allá de duda razonable que el señor Cabrera Eliza tuvo el estado mental necesario para ser declarado culpable de asesinato en primer grado bajo el Artículo 93(a) del Código Penal de Puerto Rico, *supra*. Recordemos que, el referido artículo, no exige que se pruebe propósito o conocimiento para que sea consumado el delito, porque del acto en sí se puede inferir el estado mental (sin considerar que una lectura del estatuto debe llevar a la conclusión que basta probar temeridad cuando se imputa asesinato por estrangulamiento). Por ende, el jurado, de creer que el apelante estranguló a la señora Ríos González, podía también creer que el propio acto evidenciaba el estado mental criminal. Lo cierto es que los hechos presentados permiten (o conducen) a la inferencia de que, al momento de los hechos, el señor Cabrera Eliza actuó con el estado mental que exige el Código Penal.

Cabe destacar que el testimonio de análisis de ADN excluye al apelante de ser el donante del material genético encontrado sobre la ligadura. Que el jurado haya escuchado este testimonio, y frente al monto del resto de la evidencia le haya adjudicado menos credibilidad, es una decisión que cae dentro de su discreción como juzgador de los hechos. Lo mismo sucede con las posibles

---

[155] *Id.*
[156] *Pueblo v. Rivera Cuevas*, 181 DPR 699, 716 (2011).

incongruencias o insuficiencias que uno pudiese apreciar del testimonio del Dr. Serrano.

Con ello, quedan discutidos los señalamientos de error, los cuales colegimos no fueron cometidos.

En fin, luego de un examen sosegado de toda la prueba, concluimos con certeza moral y firme convicción que el Ministerio Público probó más allá de duda razonable que el apelante cometió el delito imputado. Fíjese que, la duda razonable que opera en función de nuestro ordenamiento procesal criminal surge cuando el juzgador queda insatisfecho con la prueba presentada. Por esto, para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación[157]. En resumidas cuentas, "duda razonable" no es otra cosa que la insatisfacción de la conciencia del juzgador con la prueba presentada[158]. En ese sentido, en el caso de autos, el jurado evalúo la totalidad evidencia y determinó que los hechos fueron demostrados con prueba suficiente.

Por lo cual, no hallamos razón para intervenir con la valoración impartida por el jurado a la prueba desfilada. A pesar de que este foro intermedio se encuentra en igual posición para evaluar la prueba pericial y puede adoptar un criterio propio, no encontramos base alguna para variar dicha determinación.

## IV.

Por los fundamentos antes expuestos, los cuales hacemos formar parte de este dictamen, ***confirmamos*** la sentencia apelada.

Notifíquese.

---

[157] *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).
[158] *Íd.*

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. El Juez Adames Soto disiente con voto escrito.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

| EL PUEBLO DE PUERTO RICO<br>Apelada<br><br><br>*v.*<br><br><br>JUAN A. CABRERA ELIZA<br>Apelante | KLAN202500213 | *Apelación*<br>procedente del<br>Tribunal de<br>Primera Instancia,<br>Sala de Caguas<br><br>Caso Núm.<br>E VI2023G0016<br><br><br>Sobre:<br>ART. 93A |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

## VOTO DISIDENTE DEL JUEZ NERY E. ADAMES SOTO

a.

De lo único que no albergo duda en este caso, luego de examinar la totalidad de prueba desfilada ante el Jurado que encontró culpable al aquí apelante, es de que el Ministerio Público **no** logró demostrar **más allá de duda razonable** que la causa de la muerte de la señora Tania Ríos González fuera el "homicidio", en lugar del suicidio. Es decir, existe duda razonable sobre si el apelante estranguló a la señora Ríos González, o si esta se privó de la vida, y por ello debió haber resultado absuelto.

Advierto desde este inicio que la determinación sobre si la muerte de la señora Ríos González fue por mano propia, o porque el apelante se la causó, dependió casi por entero, o predominantemente, de la prueba pericial presentada por el Ministerio Público a través del Informe Médico Forense y el testimonio del Dr. J.G. Serrano Serrano, Patólogo Forense (patólogo forense) del Instituto de Ciencias Forenses, (ICF). No obstante, según precisaré, el referido informe es, como poco, endeble, enclenque, e insatisfactorio al explicar la conclusión a la que se llegó sobre la causa

de la muerte, a lo cual se une que el testimonio del patólogo forense durante el juicio fue decididamente impugnado cuando trató de precisar o explicar la conclusión alcanzada, según se refleja en la transcripción de la prueba oral (TPO) ante nuestra consideración.

Lo que he manifestado en el párrafo que antecede es de absoluta relevancia al verificar la función revisora de este Tribunal de Apelaciones, pues la controversia medular a dirimirse trató esencialmente sobre **prueba pericial**, y, como se sabe, **"los tribunales revisores se encuentran en la misma posición que el foro recurrido para evaluar la prueba pericial o documental presentada en un caso y adoptar su propio criterio"**. *Pueblo v. Hernández Doble*, 210 DPR 850, 865 (2022) (Énfasis provisto) [1].

Además, otra prueba circunstancial admitida como evidencia, no proveniente del patólogo forense, también sirvió, en su conjunto, para insertar la duda razonable sobre cómo ocurrió la muerte de la señora Ríos González. En atención a lo cual, en los párrafos que siguen abordaré con mayor detalle los asuntos advertidos.

b.

i.

El Pueblo simplemente no logró cumplir con el *quantum* requerido para demostrar más allá de duda razonable lo que propuso, que la señora Ríos González Ríos fuera estrangulada por el apelante, en lugar de que esta se hubiese quitado la vida[2]. La prueba pericial para probar este hecho fue parca y ampliamente contradicha, al igual que el resto de la prueba circunstancial.



---

[1] Esta digresión responde a que, **de ordinario**, *el Jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba, pues es quien normalmente están en mejor condición de aquilatar la prueba, mereciendo deferencia de este foro revisor. Pueblo v. Rosario Reyes*, 138 DPR 591 (1995). No obstante, reitero, son otros los criterios que acompañan la revisión de la prueba pericial por los foros apelativos.

[2] Por cuanto juzgo adecuado el recuento efectuado en la Sentencia suscrita por mis compañeros jueces de Panel, solo me detendré en la consideración de esta premisa.

El hecho esencial del cual partir al sopesar la prueba presentada por el Pueblo, fue que este careció de algún testigo presencial que pudiera testificar sobre cómo murió la señora Ríos González, si por violencia del apelante, o por su mano propia[3]. A lo que se une que en el lugar de los hechos no se encontró prueba o signo alguno que sirviera para vincular lo ocurrido con un acto de violencia. De lo que se sigue que la prueba de mayor valor para establecer tal asunto medular fue la pericial, esencialmente sometida a través del patólogo forense, que, por su centralidad, será el primer testimonio y prueba documental que comentaré.

ii.

Lo primero que llama la atención al verificar el testimonio del patólogo forense, es su admisión de nunca haber trabajado en algún caso de muerte por auto asfixie (suicidio) mediante el uso de una ligadura. Sobre este asunto el doctor afirmó haber realizado autopsias en cientos de casos de suicidios por suspensión, pero solo había trabajado cuatro o cinco por auto asfixie, y ninguno mediante ligadura. Es decir, su experiencia con suicidios tenía que ver con casos en que el occiso se había suspendido para lograr el cometido, denominados suicidios *por suspensión*[4]. Este dato es importante por varias razones, la evidente, el perito carecía de experiencias sobre suicidios que no fueran por suspensión, como aquellos de auto asfixie por ligadura, pero también debió servir para confirmar los testimonios de los agentes de la Policía que intervinieron en la investigación, al estos afirmar solo tener experiencia con suicidios por suspensión[5].

---



[3] Tengo plena conciencia de que "la prueba circunstancial es tan suficiente como la directa para probar cualquier hecho, incluso para sostener una convicción criminal". *Admor. F.S.E. v. Almacén Ramón Rosa*, 151 DPR 711, 719 (2000). Pero la alusión en esta oración a que la causa de la muerte *careció de un testigo presencial* solo **fue resaltada con el único propósito de subrayar la importancia de la prueba pericial para establecer la forma o manera de la muerte en ausencia de testigos**, sin sugerir primacía de una prueba sobre la otra.

[4] TPO, págs. 638, 662-663.

[5] Las declaraciones de los agentes de la Policía muestran la exclusión del suicidio como causa de muerte, porque **no conocían otra forma de suicidio que no fuera mediante**

Entonces, atendiendo la teoría del patólogo forense esgrimida en sala a través del directo conducido por el Pueblo, (no explicada en ninguna parte del Informe Forense suscrito por este el 21 de marzo de 2022[6]), para concluir que la muerte fue un "homicidio"[7], en lugar de un suicidio, esta estuvo basada, en parte, en su observación de una abrasión alargada en el antebrazo derecho, e infiltrado hemorrágico en la región de la cabeza y cuero cabelludo de la señora Ríos González [8]. A partir de tales hallazgos el patólogo forense especuló en el juicio, que la abrasión en el antebrazo se debió a una *lesión de defensa*, (se defendió de un ataque del apelante), y el infiltrado hemorrágico fue causado por un supuesto golpe que el apelante le propinó en la cabeza con algún objeto sólido, antes de ahorcarla.

El patólogo forense también declaró en sala haber sopesado los siguientes asuntos al determinar la causa de la muerte: la postura en que se encontró a la señora Ríos González[9]; cierto espacio que había entre la superficie de la piel y la ligadura en el cuello, lo que, interpretó, era indicativo de que la correa, por sí sola, no ejercía presión dramática en las estructuras vasculares en la región del cuello[10], sino que fue ejercida presión en la parte posterior del cuello[11]. Es decir, el patólogo forense propuso, según ya mencioné, que, luego de golpearla, el apelante

---

**la suspensión**. Entonces, al no encontrar en la escena algún punto desde donde la occisa se hubiese suspendido, excluyeron el suicidio como posible causa de muerte, lo que condicionó la investigación. TPO, págs. 141, 188, 190.

[6] A lo largo de este disenso insisto en la carencia de explicaciones en el Informe Forense presentado como evidencia documental del Pueblo, que solo vinieron a ser dadas a través del testimonio del patólogo forense durante el juicio (ni siquiera en vista preliminar), no porque ello contravenga alguna regla evidenciaria, sino porque llama la atención la cruda carencia de datos importantísimos, descripciones, justificaciones o explicaciones esenciales omitidas para comprender la conclusión alcanzada en tal escrito. **La sola lectura de dicho Informe da la impresión de que el patólogo forense solo se planteó el homicidio, sin auscultar siquiera la posibilidad de que fuera un suicidio, sin ni siquiera contrastar este con aquél.**

[7] El patólogo forense no se refiere a la acepción de *homicidio* del Art. 95 de nuestro Código Penal, sino que utiliza dicho vocablo como un término genérico para indicar que la muerte fue causada por un tercero.

[8] TPO, págs. 643 a la 648.

[9] TPO, págs. 651-652.

[10] TPO, págs. 637-640, 653-654.

[11] TPO, pág. 648



haló con la ligadura el cuello de la señora Ríos Gonzáles, causándole la muerte por asfixie.

iii.

Sin embargo, respecto a la primera explicación dada en sala por el patólogo forense para sostener su teoría del asesinato, (al identificar la lesión en el antebrazo como una *herida de defensa,* presuntamente indicativa de violencia por parte del apelante hacia la señora Ríos González), simplemente juzgo que fue desmontada mediante el contrainterrogatorio. Me refiero a que, luego de la defensa dejar establecido que el patólogo forense *no tenía experiencia alguna* con suicidios mediante ligadura[12], condujo a este perito a admitir que: en el Informe Forense *no* había mencionado la teoría sobre tal *herida* como una de *defensa* ante una presunta agresión del apelante; que **tampoco podía proveer indicación alguna sobre la causa de dicha herida, ni el momento o el día en que la sufrió, de manera que <u>ni siquiera podía determinar si la herida fue causada el día de la muerte</u>**[13]. Las contestaciones del patólogo forense al contrainterrogatorio que acabo de subrayar fueron expresamente reafirmadas por este tanto en el turno de redirecto, como en el recontrainterrogatorio[14], llegando a afirmar que **<u>no contaba con datos para descartar otros posibles escenarios respectos a tal herida</u>**[15].

Idéntica suerte corrió la teoría dada por el patólogo forense acerca del *infiltrado hemorrágico en la región de la cabeza,* como indicativo de violencia por el apelante hacia la señora Ríos González. Valga reiterar que tal teoría solo surgió el día del juicio, pues no se mencionó en el Informe Forense suscrito por patólogo forense. A pesar de la centralidad que le dio al infiltrado hemorrágico en su conclusión de que intervino un homicidio, en su testimonio el patólogo forense **no pudo precisar: cómo**

---

[12] TPO, pág. 663.
[13] TPO, pág. 671.
[14] TPO, págs. 686 y 688, respectivamente.
[15] TPO, pág. 688.



la señora Ríos González sufrió el golpe en la cabeza que causó el **infiltrado; si fue uno o varios golpes; el supuesto objeto con que fuera golpeada**[16]. Aunque resulte repetitivo, el patólogo forense testificó que **no podía determinar la causa del referido infiltrado, como tampoco la fecha en que ocurrió la lesión que dio lugar al infiltrado, o siquiera si tal lesión ocurrió el día en que aconteció la muerte de la señora Ríos González**[17]. Es más, luego del patólogo forense admitir que no podía determinar cuándo ocurrió el golpe a la cabeza de la señora Ríos González que causó el infiltrado, (si semanas antes, días antes, o ese día), aceptó **no poder descartar que el golpe fuera resultado de haberse "achocao" con el** *counter* **de la cocina cuando perdió el conocimiento, en lugar de que le propinaran un golpe**[18]. El patólogo forense también afirmó **que resulta posible que una persona que se suicida pueda sufrir golpes como causa de ello**[19].

Además, la defensa se detuvo a examinar la teoría del patólogo forense acerca de que la señora Ríos González presuntamente no pudiera causarse la muerte, por cuanto la ligadura no estaba suficientemente apretada, o exhibía un espacio que indicaba que el apelante pudo haber puesto sus dedos adentro para ejercer presión y ahorcarla. Con relación a esta teoría, valga reiterar, que surgió por primera vez en el juicio, pues no se incluyó en el Informe Forense. En cualquier caso, una vez fue establecido mediante el contrainterrogatorio que **el patólogo forense sí había leído sobre casos de suicidios por estrangulación mediante ligadura donde personas se habían amarrado tres veces el cuello**, este declaró que en este caso: **no se habían tomado fotos sobre la alegada separación entre la ligadura y el cuello, ni apuntado en el Informe Forense una medida sobre el espacio de separación entre el cuello y la ligadura, tampoco que la ligadura estuviera tan ajustada**



---

[16] TPO, págs. 673-674.
[17] TPO, pág. 673.
[18] TPO, pág. 689.
[19] TPO, pág. 676.

**como para impedir la respiración**[20]. De nuevo, a pesar de la centralidad que suponía en la teoría del patólogo forense cuán *apretada* estaba la ligadura al cuello de la señora Ríos González, este no se ocupó de compilar evidencia documental que sirviera para ilustrar cuán ajustada, suelta, ceñida, relajada, o comprimida se encontraba la ligadura al cuello.

En la misma tónica, o lo que fue una constante en el testimonio del patólogo forense al enfrentarlo con hallazgos plasmados en el Informe Forense que suscribió, este admitió en sala: no haber incluido información en dicho escrito sobre la teoría de que la señora Ríos González hubiese sido halada por el apelante a través de la ligadura; ni siquiera en su testimonio en vista preliminar mencionó la especulación de que el apelante la cogiera por la parte de atrás y halara con la ligadura; o la explicación sobre surcos en el cuello que tendiera a indicar que fue halada. Sin embargo, el patólogo forense **aceptó que, el que la señora Ríos González no tuviera las manos dentro de la ligadura <u>no necesariamente significaba que estuviera impedida de autoasfixiarse</u>, y admitió que en las fotos no se veía muestras de violencia o una escena violenta**[21].

Aunque el mero examen del testimonio del patólogo forense que aquí recojo juzgo que bastaría para dejar manifiesta la duda razonable sobre la causa de la muerte en este caso, existe otra prueba pericial que debilitó aún más la ya frágil teoría que colocó al apelante *halando* a la señora Ríos González por el cuello mediante la ligadura para ahorcarla.

Primero, fue un hecho bien establecido que **no se encontraron *fracturas en el cartílago tiroideo, ni en el hueso hioides*** del cuello de la señora Ríos González, al patólogo forense realizar la autopsia, según surge del propio Informe Forense y de la declaración del patólogo

---

[20] TPO, págs. 668-670.
[21] TPO, págs. 668-670, 679.

forense en sala[22]. Es de notar que, una vez el patólogo forense expresó este dato en el examen directo que le realizó el Pueblo, el Ministerio Público *decidió* no solicitar explicación alguna sobre qué importancia revestía ese hecho para las posibles causas sobre la muerte de la señora Ríos González. Por fortuna, la defensa sí lo hizo en su turno de contrainterrogatorio. Así, una vez la defensa le recordó al patólogo forense su premisa o deducción de que la señora Ríos González fue *fuertemente halada por el cuello, por la espalda*, procedió a confrontarlo con el hecho de que, a pesar del presunto halón, a esta **no se le encontró fractura alguna en el cuello, sino que este estaba intacto.** Más aún, a través de esta cadena de preguntas, se dirigió al patólogo forense a admitir **que en lo suicidios se examina tal dato,** (fracturas en el cartílago tiroideo y el hueso hioides en específico), porque **la ausencia de fractura en el cartílago y hueso aludidos <u>puede ser típico de un suicidio por ligadura</u>**[23]. (Énfasis y subrayado provistos).

Segundo, y estrechamente relacionado con lo anterior, según el testimonio en sala de la analista de ADN del ICF, señora W. Torres Santiago, **al realizar la prueba de contenido de ADN en la referida ligadura** concluyó que: 1) **encontró un perfil genético parcial que concuerda con el perfil genético de Tania Ríos González, <u>que es la persona que tal vez estaba en mayor contacto con la ligadura</u>**[24], (énfasis y subrayado provistos), y; 2) **<u>el apelante fue excluido de ser donante de ADN en dicha ligadura,</u> o *no es consistente* <u>con ser el donante</u>**[25]. Súmese a esto la explicación ofrecida por la misma testigo sobre lo que denominó *pruebas de contacto* relativas a la ligadura, cuyos resultados pueden variar **dependiendo de varios factores**. Entre los factores que determinan las *pruebas de contacto* se encuentra, *la fuerza que se ejerció en el objeto*, en este caso, la fuerza ejercida por el



---

[22] TPO, pág. 650. Informe Médico-Forense, página 4.
[23] TPO, págs. 683-684.
[24] TPO, págs. 337 y 339.
[25] TPO, pág. 366.

apelante en la ligadura. Es decir, a mayor fuerza en la ligadura, mayor el traslado de material genético. ¿No se supone que el apelante hubiese halado con fuerza el cuello de la señora Ríos González utilizando la ligadura? Si la respuesta es en la afirmativa, ¿cómo entonces no transmitió material genético a la ligadura?

Es decir, además de la ausencia de las fracturas en el cuello que suelen indicar suicidio en lugar de homicidio, **contamos con la exclusión de material genético del apelante en la ligadura que este presuntamente *haló fuertemente para ahorcar a la señora Ríos González*,** aunque sí hay material genético en dicha ligadura, pero de la propia occisa. Esto, francamente, desborda la simple prueba de refutación y ubica de manera muy cercana en la prueba exculpatoria, en tanto resulta más compatible o descriptivo de un suicidio, que de un asesinato.

Como si fuera poco lo hasta aquí señalado, (no lo es), juzgo otro dato trascendental el revelado en sala sobre el contenido del récord siquiátrico de la señora Ríos González. A través del testimonio del Agente J. Torres Ramírez, y luego de que se le permitiera a este refrescar su memoria con la lectura de sus notas, al ser inquirido sobre ello, este testificó que **en el récord médico-siquiátrico de la señora Ríos González** se hizo constancia que esta <u>**se había intentado suicidar**</u> **entre** <u>**diez y trece ocasiones**</u>[26], y que parte de **las razones para dichos intentos suicidas eran cuando tenía: 1) <u>problemas con la ley</u>; 2) <u>y con Juan</u>**" (el apelante)[27]. (Énfasis y subrayado provistos). El mismo testigo añadió al ser preguntado por la defensa, que **la señora Ríos González tenía un caso pendiente por agresión a un policía, la semana en que ocurrieron estos hechos**[28]. (Énfasis provisto). Esta

---

[26] TPO, pág. 560-561.
[27] TPO, pág. 565.
[28] Id.

parte del testimonio del Agente Torres Ramírez no fue contradicho o impugnado en modo alguno.

Describo la información anterior como *trascendental* por varias razones: 1) aunque se sabe que, de ordinario, las personas que intentan suicidarse suelen repetir dicho propósito, en este caso tal conducta reiterativa no es una mera especulación, sino un hecho bien establecido, pues la señora Ríos González intentó causar su propia muerte en un número significativo de ocasiones (de diez a trece veces), de modo que resultaba racionalmente previsible que lo intentara nuevamente; 2) la falta de violencia en la escena, ausencia de fracturas en el cuello, exclusión de ADN del apelante en la ligadura, especulación sobre cómo se produjeron los presuntos golpes en el brazo y cabeza de la señora Ríos Gonzáles, y cuándo fueron sufridos, junto a tal número de intentos suicidas, respaldan más la teoría de que esta se privara de la vida *vis a vis* que fuera asesinada.

Cabe conocerse que, al redactar el Informe Forense, y posterior a ello, el patólogo forense **no** se pudo beneficiar de sopesar la información sobre el número de intentos de suicidios de la señora Ríos González, porque el Agente Torres Ramírez no le transfirió el dato.

Aunque, de suyo, la información sobre los reiterados intentos de suicidio por parte de la señora Ríos González debió tener gran relieve al considerar si la causa de la muerta fue esta o un asesinato, como subrayé, a esa información se le acompañó la identificación en el récord médico sobre **razones (detonantes) para tales intentos suicidas,** a saber; cuando esta enfrentaba **problemas con la ley,** y por **problemas con el apelante**. Según la prueba desfilada, **ambos detonantes se encontraban muy presentes la noche que desembocó en la muerte de la señora Ríos González**.

En cuanto al detonante que refiere a *problemas con la ley*, ya enfaticé, que el propio testigo del Pueblo, Agente Torres Ramírez, declaró,

sin ser impugnado, que en la misma semana en que aconteció su muerte, la señora Ríos González **tendría que enfrentar un proceso judicial, por alegadamente haber agredido (mordido) a un compañero policía**[29]. *Ergo,* resultaba perfectamente razonable prever el grado de estrés o ansiedad que debía causar en la señora Ríos González la cercanía de enfrentar tal procedimiento criminal.

El segundo detonante o *razón* identificado en el récord médico con los intentos suicidas de la señora Ríos González, los *problemas con el apelante,* resultó claramente ilustrado a través de los testimonios de los guardias de seguridad de la urbanización, y del propio Agente Torres Ramírez. En cuanto a este último, testificó sobre las declaraciones que le hiciera el propio apelante sobre los distintos problemas que enfrentaba en su relación con la señora Ríos González, en las que intervinieron varios procesos legales, inclusive la expedición de una *Orden de Protección Ex parte* (OP), siendo el apelante el sujeto protegido[30]. De hecho, el Agente Torres Ramírez confirmó la existencia de la referida OP, en protección del apelante, que se encontraba vigente a la fecha de la muerte de la señora Ríos González[31]. Además, la descripción de las conductas exhibidas por el apelante y la señora Ríos González horas antes de su muerte, según descritas en los testimonios vertidos por los guardias de seguridad de la urbanización[32], también son identificables con el detonante denominado *problemas con el apelante.*

Por causa de todo lo que antecede, del conjunto de lo que acabo de pormenorizar, es que sostengo firmemente que el Ministerio Público no logró superar el *quantum* de prueba que nuestro ordenamiento le exigía para lograr la culpabilidad del apelante. Es decir, la prueba pericial de la que dependió el Pueblo para establecer que el apelante asesinó a la señora Ríos González ahorcándola con una ligadura, no resultó



---

[29] TPO, pág. 565-566.

[30] TPO, págs. 493-495.

[31] Id.

[32] TPO, págs. 201-202, 204, 207-209, 211, 216, 230, 594-595.

suficiente ni satisfactoria, y mucho menos produjo grado alguno de certeza o convicción moral sobre los hechos. Al contrario, la unión del Informe Forense, con el testimonio del patólogo forense lo que logró fue transmitir una mera narrativa, en clave de sospecha, que estuvo basada en una intuición. Tal intuición, insuficiente en derecho de por sí para cumplir el *quantum* de prueba exigido, a su vez, quedó impugnada por el contrainterrogatorio y la demás prueba aquí discutida, insertando una duda radical acerca de si ocurrió un suicidio.

c.

Luego del análisis de la totalidad de la prueba, habiendo prestado particular atención a la pericial, me resulta evidente que el veredicto del Jurado en este caso "se encuentra en franco conflicto con el balance más racional, justiciero y jurídico". *Pueblo v. Hernández Doble*, 210 DPR 850, 865 (2022). En la misma tónica, el examen riguroso de la prueba presentada "me deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado", de lo que aquí he dejado detallada constancia. *Pueblo v. Santiago*, 176 DPR 133, 148 (2009).

Como adelanté en la primera nota al calce, reconozco que, **de ordinario**, *el Jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba, pues es quien normalmente están en mejor condición de aquilatar la prueba, mereciendo deferencia de este foro revisor. Pueblo v. Rosario Reyes*, supra. Pero he remachado a lo largo de este disenso que la prueba de la que se valió esencialmente el Pueblo para demostrar el presunto asesinato, en lugar del suicidio, fue eminentemente pericial, ante la cual nos encontramos en igual posición que el Jurado para examinarla. *Pueblo v. Hernández Doble*, supra. Además, el conjunto de la prueba desfilada, no solo la pericial, también inculcó la duda razonable sobre la manera o forma de la muerte.

Nunca resulta liviano enfatizar el *quantum* de prueba requerido al Pueblo para vencer el derecho constitucional a la presunción de la

inocencia[33], que es el de "más allá de duda razonable". *Pueblo v. Martínez Toro*, 200 DPR 934, 855 (2018). Esto supone que recaía en dicha parte "presentar prueba que, además de ser suficiente, fuera satisfactoria, es decir, que produjera certeza o convicción moral en una conciencia exenta de preocupación". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146 (2020). Por lo explicado, la prueba pericial de la que dependió el Pueblo para establecer que el apelante asesinó a la señora Ríos González, ahorcándola con una ligadura, no me resultó suficiente, ni satisfactoria, y mucho menos produjo en mi conciencia judicial grado alguno de certeza o convicción moral, sino que, al contrario, más bien insertó en mi juicio la duda de que hubiese sido un suicidio.

La profunda insatisfacción que me produce la prueba presentada por el Ministerio Público para demostrar que el apelante asesinó a la señora Ríos González, en lugar de que esta se privara de la vida, me dejaban como única alternativa absolver al apelante, al albergar duda razonable, y de aquí que, respetuosamente, disienta del curso decisorio de mis estimados compañeros jueces de Panel.

Por las razones expuestas, respetuosamente disiento.

En San Juan, Puerto Rico, a 14 de abril de 2026.

Nery Enoc Adames Soto
Juez de Apelaciones

---

[33] Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico. LPRA, Tomo 1.